Roosevelt THURMOND, Plaintiff,

v.

DELTA WELL SURVEYORS, et al., Defendants.

GULF OIL CORP., Plaintiff–Appellee,

v.

DELTA WELL SURVEYORS and P & S Well Service, Inc., Defendants–Appellants.

No. 86–3853.

United States Court of Appeals, Fifth Circuit.

Feb. 4, 1988.

Deborah B. Rouen, Joel L. Borrello, Adams & Reese, New Orleans, La., for defendants-appellants.

Jeanmarie LoCoco, Edward J. Koehl, Jr., Jones, Walker, Waechter, Poitevent, Carrere & Denegre, New Orleans, La. for plaintiff-appellee.

Before WISDOM, GARWOOD, and JONES, Circuit Judges.

WISDOM, Circuit Judge:

This case raises another close question on the applicability of maritime law to offshore oil and gas activities. The key question is whether the primary obligation of a contract to perform wireline services for a well in navigable waters is maritime or non-maritime. This issue is essentially a choice of law problem: whether a contract to perform wireline services in navigable waters is governed by maritime law or state law. The parties agree that if the contract is nonmaritime, it is governed by state law and its indemnity provision is invalid under the Louisiana Oilfield Indemnity Act (LOIA).[1] But if the agreement is a maritime contract, then its indemnity provision is enforceable under maritime law.[2] The defendants/appellants, Delta Well Surveyors ("Delta") and P & S Well Services ("P & S"), contend that the primary obligation is nonmaritime, because its object is to provide wireline services, which is not a maritime activity. The plaintiff/appellee, Gulf Oil Corp., asserts, however, that the contract is maritime, because its predominant obligation is to provide a barge and crew with wireline equipment, indispensable maritime components of offshore wireline services. We hold that the district court erred in determining that this contract is governed by maritime law. Although this contract of necessity contained incidental maritime obligations, this suit

---

1. Act No. 427, 1981 La. Acts 850 (codified as amended at La.Rev.Stat.Ann. § 9:2780 (West Supp.1987)).

2. *See, e.g., Theriot v. Bay Drilling Corp.*, 783 F.2d 527, 538–39 (5th Cir.1986).

arose out of P & S's nonmaritime primary obligation to perform wireline services.[3] The enforceability of this contract's indemnity provision is, therefore, subject to state law.

## I. FACTS AND PRIOR PROCEEDINGS

On February 1, 1981, P & S and Gulf Oil entered into a "blanket contract", which provided that P & S would perform wireline services for Gulf Oil's offshore wells in the delta areas of Louisiana. The contract also provided that P & S would indemnify Gulf Oil for "all causes of action, suits or other litigation ... of every kind and character"[4] that might arise out of their contractual relationship. The contract was not binding standing alone. Like many other offshore oil production contracts, "[t]he agreement provided the framework for subsequent contracts which were to result from verbal or written work orders ...".[5] Such a contract "merely sets out the rules of the game in the event the parties decide to play ball."[6]

P & S provided the Barge KATHY and its crew to perform the wireline services assigned by Gulf Oil. The Barge KATHY is a self-propelled wireline barge equipped with a hydraulic wireline unit, a hydraulic pump, storage tanks, glands, a blow-out preventer, and other wireline tools. The barge's crew consisted of Arnold Buras, the barge operator, and helper Roosevelt Thurmond. The crew both operated the barge and performed the wireline services.

On March 8, 1983, the crew received a verbal assignment from Gulf Oil to perform a wireline service on Well JG Timelot B, 99D, in Gulf Oil's Northwest Bay field, located in Louisiana's territorial waters. The crew's specific assignment was to establish a water injection rate, which first required them to open a one-half inch valve on the wellhead to bleed the casing pressure from the well. Roosevelt Thurmond stepped off the barge and on the wellhead to open the valve. When he did the stem and seat of a motor valve popped off the wellhead and struck his chin.

Thurmond filed a personal injury suit against Gulf Oil, and Gulf Oil filed suit seeking indemnity under the blanket contract against P & S and Delta, Thurmond's employer. The two cases were later consolidated. Delta and P & S filed a motion for summary judgment arguing that Gulf Oil's claims were barred by the LOIA. The district court granted the motion for summary judgment, but later vacated the judgment on the ground that the LOIA was

---

**3.** Also implicated in this appeal are various policies: the State of Louisiana's policy regarding oilfield indemnity agreements, the policy of protecting the parties' justified expectations, the basic policies underlying the law of admiralty, and the policy of predictability and uniformity of result. These policies often are considered relevant factors in a choice of law problem. *See* Restatement (Second) of Conflict of Laws § 6(2) (1971).

**4.** The agreement provided in full that P & S, the contractor,

agrees ... to protect, indemnify, and save Gulf harmless from and against all claims, demands, and causes of action, suits or other litigation (including defending all causes of action, suits of other litigation, or indemnifying and holding Gulf harmless from and against all costs, expenses, and attorney's fees incurred by Gulf in the defense of such causes of action, suits or other litigation brought against it on account of any obligation which Contractor is bond for hereunder) and every kind and character arising in favor of Contractor or third parties, including but not limited to personnel furnished by Contractor on

account of personal injuries or death or damage to property, whether arising out of negligence on the part of Gulf or otherwise, including any claim based upon the unseaworthiness of any vessel or upon any theory of strict liability, in any way occurring, incident to, or arising out of the work performed by Contractor hereunder, and particularly, but not by way of limitation, against loss or damage whatsoever caused by fire, explosions, or accidents of any kind during the performance of and until the completion of said work and the acceptance thereof by Gulf.

**5.** *Matte v. Zapata Offshore Co.*, 784 F.2d 628, 630 (5th Cir.1986).

**6.** *Page v. Gulf Oil Corp.*, 775 F.2d 1311, 1315 (5th Cir.1985). The agreement between P & S and Gulf Oil confirmed Gulf Oil's "understanding with [P & S] concerning any kind of work [P & S] may be requested to perform from time to time for Gulf Oil Corporation ...; it being understood and agreed that either party may cancel this contract by giving the other party ten (10) days written notice".

inapplicable because the parties' agreement was a maritime contract. The district court then granted Gulf Oil's motion for summary judgment on the ground that Gulf Oil was entitled to indemnity under the blanket contract as a matter of law. This appeal followed.

## II. DISCUSSION

A major treatise on admiralty, *Benedict on Admiralty*, defines the traditional concept of a maritime contract broadly:

> In matters of contract, the principal determinant which emerges from a long course of decisions is the relation which the cause of action bears to the ship, the great agent of maritime enterprise, and to the sea as a highway of commerce. A contract relating to a ship in its use as such, or to commerce or navigation on navigable waters, or to transportation by sea or to maritime employment is subject to maritime law and the case is one of admiralty jurisdiction, whether the contract is to be performed on land or water.[7]

P & S and Delta argue that a wireline service contract does not fit within this definition of a maritime contract, because the wireline service contract does not address a ship, navigation, or any traditional maritime activity. The contract instead addresses only an oil production activity that is performed on land and at sea. But Gulf Oil argues that the contract is maritime within the *Benedict* formulation because a contract for offshore wireline services necessitates the use of a vessel, a barge equipped to perform wireline services, the vessel's only mission.

The development of offshore oil production has necessitated an expansion of maritime law[8] generally and the definition of a maritime contract specifically. As Gulf Oil notes, this Court in *Theriot v. Bay Drilling Corp.*,[9] held that a contract for offshore oil and gas drilling is a maritime contract, because "[o]il and gas drilling on navigable waters aboard a vessel is recognized to be maritime commerce".[10] Offshore oil production certainly is considered part of maritime commerce, and Gulf Oil is correct in arguing that this contract for offshore wireline services included some maritime obligations.

P & S and Delta argue that there are, however, limits to the ability of maritime law to deal adequately with oil production problems, as Congress recognized in the enactment of the Outer Continental Shelf Lands Act.[11] This act, for example, requires that fixed platforms on the outer continental shelf "be treated as though they were federal enclaves in an upland state".[12] Thus, this Court held in *Laredo Offshore Constructors, Inc. v. Hunt Oil Co.* that the Lands Act requires the application of state law to a contract for the construction of a stationary platform on

---

**7.** 1 E. Jhirad, A. Sann, B. Chase & M. Chynsky, *Benedict on Admiralty* § 183, at 11–6 (7th ed. 1985); *Cf.* G. Gilmore & C. Black, *The Law of Admiralty* § 1–10, at 22 (2d ed. 1975).

**8.** An oil field worker may also be a seaman. *See, e.g., Offshore Oil Co. v. Robison,* 266 F.2d 769 (5th Cir.1959).

**9.** 783 F.2d 527 (5th Cir.1986).

**10.** 783 F.2d at 538–39; *see also Corbitt v. Diamond M. Drilling Co.,* 654 F.2d 329 (5th Cir. 1981).

**11.** *See* 43 U.S.C. §§ 1331 *et seq.* (1982); *Rodrigue v. Aetna Casualty & Surety Co.,* 395 U.S. 352, 89 S.Ct. 1835, 23 L.Ed.2d 360 (1969); *see also* Note, *Admiralty—Wrongful Death—Application of Law of the Coastal State of Torts Occurring on Offshore Drilling Platforms,* 44 Tul.L. Rev. 354 (1970).

**12.** *Laredo Offshore Constructors, Inc. v. Hunt Oil Co.,* 754 F.2d 1223, 1230 (5th Cir.1985). The Lands Act's "purpose of incorporating state law was to permit actions arising on these federal lands to be determined by rules essentially the same as those applicable to actions arising on the bordering state lands". *Gulf Offshore Co. v. Mobil Oil Corp.,* 453 U.S. 473, 489, 101 S.Ct. 2870, 2881, 69 L.Ed.2d 784, 798 (1981) (Blackmun J., concurring). Although the Lands Act does not apply in this case, the purpose of the Lands Act should be kept in mind here to maintain and protect the uniformity of maritime law. It would be incongruous for this Court to apply maritime law in cases that developed (as this one did) in state territorial waters, while applying state law to actions that developed on the federal lands of the outer continental shelf.

the shelf, even though "the contract no doubt contemplates the hiring of vessels and seamen to build the structure".[13]

P & S and Delta argue that *Laredo* demands a similar result in this case, even though this case is not governed by the Land's Act. In *Laredo*, which involved a contract containing both maritime and nonmaritime obligations, this Court stated, "It is fundamental that the mere inclusion of maritime obligations in a mixed contract does not, without more, bring nonmaritime obligations within the pale of admiralty law."[14] The defendants correctly argue that the *Laredo* rule of mixed contract interpretation is not limited in its application to Lands Act cases; the severability of maritime and nonmaritime obligations in a variety of contracts is well established.[15] The main question then is whether, as P & S and Delta argue, the contract for wireline services in this case is mixed with maritime and nonmaritime obligations, and whether this dispute arose out of the performance of a separate nonmaritime obligation governed by state law.

The principal obligation under this contract was to perform wireline services, clearly a nonmaritime obligation in the sense that it does not concern the operation of the vessel. Such services are peculiar to the oil and gas industry, not maritime commerce. Wireline services are performed on land-based wells and offshore wells, and wireline services present hazards and problems peculiar to the oil and gas industry. "Maritime law in the strict sense has never had to deal with the resources in the ground beneath the sea, and its whole tenor is ill adapted for that purpose."[16] On the other hand, state law is well suited to cope with oil production problems.

Furthermore, this suit arose out of the performance of the contract's principal—nonmaritime—obligation. Roosevelt Thurmond filed suit for injuries that he sustained while performing a wireline service, and Gulf Oil seeks indemnity for its liability to him. When he was injured, Thurmond was not engaged in the performance of a maritime obligation, such as one relating to the navigation or operation of the Barge KATHY. Indeed, when he was injured, Thurmond was standing on the small protective wooden jacket of the wellhead, a fixed platform, and he was opening a well valve. The wellhead was an island, a small one but an island.

We reject Gulf Oil's contention that this Court's holding in *Theriot v. Bay Drilling Corp.* is indistinguishable from this case. In *Theriot* the contract was for drilling, and it specifically addressed the use of a ship:

> The contract provided that Bay Drilling would furnish the equipment, materials, supplies, and services necessary to the drilling and completion of the well. As Exhibits A and C of the contract reveal, the main piece of equipment to be supplied by Bay Drilling was a vessel, a submersible drilling barge known as "The Drilling Barge Rome". The contract did not merely touch incidentally on a vessel, but directly addressed the use and operation of the "Drilling Barge Rome".[17]

The wireline service contract between P & S and Gulf Oil did not address in any way the use of a ship. The Barge KATHY's use for the transportation of wireline equipment and workers was incidental to the contract's principal obligation.

The district court determined that, because offshore wireline services require the

**13.** *Laredo,* 754 F.2d at 1231.

**14.** *Id.*

**15.** *D.M. Picton & Co. v. Eastes,* 160 F.2d 189, 192 (5th Cir.1947); *Berwind–White Coal Mining Co. v. City of New York,* 135 F.2d 443, 447 (2d Cir.1943); *The Pennsylvania,* 154 F. 9, 12–13 (2d Cir.1907); *Luckenbach S.S. Co. v. Gano Moore Co.,* 298 F. 343, 344 (S.D.N.Y.1923); *see also* 1 *Benedict on Admiralty* § 184, at 11–10.

**16.** *Outer Continental Shelf Lands Act, Hearings on S. 1901 before the Senate Committee on Interior and Insular Affairs,* 83d Cong., 1st Sess. 668 (1953) (quoted in *Rodrigue v. Aetna Casualty & Surety Co.,* 395 U.S. at 365 n. 12, 89 S.Ct. at 1842 n. 12).

**17.** 783 F.2d at 538.

use of a barge, the parties agreed implicitly to a maritime contract, and the court cited, as support for its holding, *Lefler v. Atlantic Richfield Co., Inc.*[18] *Lefler* involved a catering service contract for an offshore platform, on its face a nonmaritime contract. In *Lefler,* however, the parties later extended their contract to include maritime obligations. The plaintiff, for example, provided maid service to the workers on a barge moored alongside the platform, and he was injured when he slipped while crossing from the platform to the barge. The Court determined that while, as between *employer and employee,* a finding of seaman status suffices for the application of maritime law to their relationship, the contractual relationship between ARCO and Gulf Coast was not governed by the fact that the plaintiff was a seaman. The holding that maritime law governed was based on the parties' agreement that despite the landside nature of catering, Lefler's job was that of a "seagoing housemaid, and that he was injured in the course of performing" that separate maritime service.[19] In other words, *Lefler* was not a case where implicit and incidental maritime obligations transformed a nonmaritime contract into a wholly maritime contract. The cause of action in *Lefler* arose out of the performance of a separate maritime obligation. *Lefler* is inapposite.

The wireline services in this contract action resemble the operations in a tort action in which this Court held maritime law inapplicable. In *Sohyde Drilling & Marine v. Coastal State Gas Prod.,*[20] this Court applied Louisiana law to an action for property damage caused by an offshore well blowout. The blowout occurred aboard a drilling barge in Louisiana waters. The Court applied the *Executive Jet Aviation, Inc. v. Cleveland,*[21] "maritime relationship" rule and decided that the workover operations did not have a substantial maritime flavor. The parties, a well operator and a workover contractor, did not have peculiar maritime roles; the barge was not engaged in a maritime activity at the time of the accident; the instrumentalities, such as blowout preventers, did not have a "peculiarly salty flavor"; and the injury did not have a maritime character.[22] Consequently, the traditional role of admiralty did not compel the *Sohyde* Court to apply maritime law.[23]

## III. CONCLUSION

In sum, although the question is close and well briefed by counsel for the parties, we conclude that this contract contained severable maritime and nonmaritime obligations, and the principal obligation of this contract was nonmaritime. Because this suit arose out of the performance of a nonmaritime obligation, we hold that the enforceability of this contract's indemnity provision is subject to state law. We REVERSE the district court's order, which

**18.** 785 F.2d 1341 (5th Cir.1986).

**19.** *Id.,* 785 F.2d at 1343.

**20.** 644 F.2d 1132 (5th Cir.1981).

**21.** 409 U.S. 249, 93 S.Ct. 493, 34 L.Ed.2d 454 (1972).

**22.** *Sohyde,* 644 F.2d at 1136–38.

**23.** *See also Houston Oil & Minerals v. American Int'l Tool,* 827 F.2d 1049 (5th Cir. 1987) (following *Sohyde* ).

Also worth noting is what makes the classification of the primary obligation of this contract important: the enforceability of its indemnity provision. This contract's indemnity provision is invalid under the LOIA. The Louisiana Legislature enacted the LOIA "to remedy a perceived imbalance in the relative bargaining position of the contracting parties in the oil industry, for the purpose of enhancing safety in that dangerous industry." *Matte v. Zapata Offshore Co.,* 784 F.2d at 631. *See* La.Rev.Stat.Ann. § 9:2780(A) (West Supp.1987). This legislative purpose has serious economic and moral justifications. *See* Note, *Contractual Indemnity Under Maritime Law and Louisiana Law,* 43 La.L.Rev. 189, 191–192 (1982). Although the LOIA's purpose is not determinative, applying the State of Louisiana's policy to improve oilfield safety in this case is at least consistent with traditional admiralty principles. *See, e.g., Matte v. Zapata Offshore Co.,* 784 F.2d at 631 (where this Court invalidated a contractual choice of law provision as "an obvious end-run of the Louisiana Legislature's effort to improve oilfield safety"). *See also* Note, 43 La.L.Rev. at 199 (admiralty indemnity rule of freedom to contract applies only to "parties of relatively equal bargaining power").

vacated its earlier grant of summary judgment in favor of the defendants, and remand the case with directions to the district court that it grant summary judgment in favor of the defendants/appellants.

GARWOOD, Circuit Judge, concurring:

I am generally in agreement with Judge Wisdom's persuasive opinion, but am troubled by the tension, or perhaps outright inconsistency, between many of our opinions in this area. More particularly, it is difficult for me to reconcile our decision in *Sohyde Drilling & Marine Co. v. Coastal States Gas Producing Co.*, 644 F.2d 1132, 1136–37 (5th Cir.), *cert. denied*, 454 U.S. 1081, 102 S.Ct. 635, 70 L.Ed.2d 615 (1981), with our decisions in *Transcontinental Gas Pipeline Corp. v. Mobile Drilling Barge*, 424 F.2d 684, 691 (5th Cir.), *cert. denied*, 400 U.S. 832, 91 S.Ct. 65, 27 L.Ed.2d 64 (1970); *Corbitt v. Diamond M. Drilling Co.*, 654 F.2d 329, 332 (5th Cir. 1981); and *Theriot v. Bay Drilling Corp.*, 783 F.2d 527, 538–39 (5th Cir.1986). *Sohyde* was followed as binding precedent, though seriously questioned, in *Houston Oil & Minerals v. American International Tool Co.*, 827 F.2d 1049, 1052–55 (5th Cir.1987). It may be noted that each of these separate lines of cases seems to proceed without considering the other. *Sohyde* does not cite *Transcontinental Gas Pipeline*, and neither does *Houston Oil & Minerals*, which likewise does not cite *Corbitt* or *Theriot*. On the other hand, neither *Corbitt* nor *Theriot* cites *Sohyde*. Some recognition of this tension or possible conflict is reflected in *Laredo Offshore Constructors, Inc. v. Hunt Oil Co.*, 754 F.2d 1223, 1232 n. 11 (5th Cir.1985). However, *Laredo* seems to be grounded on the fact that the contract there in issue called for construction of a fixed platform on the outer continental shelf, and the Outer Con-

tinental Shelf Lands Act (OCSLA) is made specifically applicable to "platform construction." *Id.* at 1226. *See also* 43 U.S.C. § 1331(*l*). We concluded in *Laredo* that "the particular policy judgments embodied in the OCSLA precluded in some cases the application of maritime law quite independently of the traditional principles of admiralty," and that "the OCSLA can only be regarded as a substantive restriction of the district court's admiralty jurisdiction" (at least in certain cases). *Id.* at 1232. Here, of course, the events in issue occurred in state territorial waters, just as they did in *Transcontinental Gas Pipeline* and *Sohyde*, *Corbitt*, and *Theriot*.

The result we reach today is certainly supportable under the rationale of *Sohyde*. *See also Herb's Welding, Inc. v. Gray*, 470 U.S. 414, 105 S.Ct. 1421, 1428, 84 L.Ed.2d 406 (1985) ("[t]here is nothing inherently maritime about" building and maintaining pipes and platforms, at least not in connection with mineral exploration and development of the outer continental shelf). *But see Theriot*, 783 F.2d at 539 n. 11 (distinguishing *Herb's Welding*). Arguably, we should follow *Sohyde* in preference to *Corbitt* and *Theriot* since it preceded them, and in preference to *Transcontinental Gas Pipeline* since it preceded *Executive Jet Aviation, Inc. v. Cleveland*, 409 U.S. 249, 93 S.Ct. 493, 34 L.Ed.2d 454 (1972), on which *Sohyde* placed principal reliance. However, it seems to me that it may be desirable to consider this issue en banc, in order that we may take a more consistent approach to the question of whether and in what circumstances activities in connection with mineral development in state territorial waters are maritime (or perhaps "maritime and local," *see Kossick v. United Fruit Co.*, 365 U.S. 731, 81 S.Ct. 886, 892, 6 L.Ed.2d 56 (1960)).[1]

Given the OCSLA directed applicability of state law to such activities when con-

---

1. It may be possible to distinguish the present case from *Sohyde*. I would regard the particular work order for the Barge KATHY on this occasion, and not the "blanket contract," as the relevant agreement here. *See Matte v. Zapata Offshore Co.*, 784 F.2d 628, 630 (5th Cir.1986); *Page v. Gulf Oil Corp.*, 775 F.2d 1311, 1315 (5th Cir.1985). The work order did not simply call for the Barge KATHY to transport men and

equipment to the work site, but rather called for the barge to itself function as the base from which the work would be performed by one who was unquestionably a member of its crew and would use the equipment and machinery with which the vessel was outfitted, and which would largely remain on it, to perform the assigned task. The self-propelled barge would not jack itself down to the ocean floor to perform

ducted on the outer continental shelf, *see Lardeo,* there is plainly much to be said, as Judge Wisdom points out, for also applying state law when the same activities are conducted in the state's territorial waters.[2] In deciding which law should apply, however, it is questionable whether determinative significance should be given the Louisiana Oil Field Indemnity Act, since the rationale for applying state law in territorial waters in order to be consistent with its application on the outer continental shelf applies with equal force to state judge-made law. And, if admiralty law is to be applied, then I see no reason not to apply our general rule that indemnity contracts of this nature are entirely valid. *See Theriot,* 783 F.2d at 540; *Lefler v. Atlantic Richfield Company, Inc.,* 785 F.2d 1341, 1343 (5th Cir.1986).

its work. This arguably presents a different situation from that of the submersible drilling barge which was resting on the bottom of the canal slip in *Sohyde.* Here, it is not inconceivable that when the task assigned was finished Arnold Buras would indeed have called out "'weigh anchor.'" *See Sohyde,* 644 F.2d at 1137. Nonetheless, our cases do not seem to have made this character of distinction before, and whether it has validity and utility would in my view best be addressed by the en banc court in connection with its overall consideration of the *Sohyde* and the *Corbitt, Theriot* lines of cases.

**2.** Nevertheless, we have been cautioned, albeit in a different context, against "[t]he extension of OCSLA far beyond its intended locale." *Offshore Logistics, Inc. v. Tallentire,* 477 U.S. 207, 106 S.Ct. 2485, 2493, 91 L.Ed.2d 174 (1986). We have also recognized, at least for purposes of admiralty actions, that the uniform "common law" of admiralty displaces state wrongful death statutes in territorial waters. *Matter of S/S Helena,* 529 F.2d 744 (5th Cir.1976). *Cf. Kossick; Kermarec v. Compagnie Generale Transatlantique,* 358 U.S. 625, 79 S.Ct. 406, 3 L.Ed.2d 550 (1959).