Toby JONES

v.

BERWICK BAY OIL COMPANY, INC.

Civ. A. No. 86–5504.

United States District Court,
E.D. Louisiana.

Sept. 27, 1988.

Frank E. Lamothe, III, Lamothe & Hamilton, New Orleans, La., for plaintiff.

John F. Emmett, Randolph J. Waits, Emmett, Cobb, Waits & Kessenich, New Orleans, La., for defendant Berwick Bay Oil Co., Inc.

Patrick J. Hanna, Joseph L. Lemoine, Onebane, Donohoe, Bernard, Torian, Diaz, McNamara & Abell, Lafayette, La., for Berwick Bay Oil Co., Inc. as defendant and cross-claimant only.

William L. Brockman, New Orleans, La., for defendant, Shell Offshore, Inc.

Michael P. Wilty, Salley & Associates, New Orleans, La., for Travelers Ins. Co., intervenor.

## ORDER AND REASONS

MENTZ, District Judge.

This matter comes before the Court on cross motions for summary judgment filed by defendants, Shell Offshore, Inc. (Shell) and Berwick Bay Oil Company, Inc. (Berwick Bay). The memoranda filed by the parties presents the following issues for the Court: 1) Whether, under the terms of the contract, Berwick Bay's duty to indemnify Shell was triggered by plaintiff's accident and 2) if so, whether the Louisiana Oilfield Anti–Indemnity Act applies to Shell's cross-claim for indemnity. The Court decides both of these issues in the affirmative. In deciding the second issue, the Court must determine the nature of a blanket contract to supply fuels and greases for use, in part, by Shell's vessels. The Court holds that the contract is a "mixed" but primarily non-maritime contract, and that admiralty jurisdiction over the contract is invoked only as to fuel which is delivered to a specified vessel pursuant to a work order issued by Shell. In so ruling, the Court addresses what has been characterized as an uncertain question of admiralty law: whether a blanket contract to supply fuel for use by vessels engaged in a maritime activity is a maritime contract. Since the subject accident occurred while the plaintiff was performing a nonmaritime obligation of the contract, state law shall govern Shell's cross-claim for indemnity.

### Facts

Toby Jones filed this action to recover for personal injuries he sustained on August 30, 1986 while working as a tankerman for his employer, Berwick Bay. Jones alleges that he stepped on grease or oil on the edge of a dock leased by Shell, slipped, and fell onto a barge owned by Berwick Bay. At the time of his accident, Jones had just transported diesel fuel from Berwick Bay's main tank facility in Morgan City to its tanks located at Shell's Morgan City Terminal. Jones was injured while returning to the barge after checking the fuel gauge on Berwick Bay's fuel storage tanks.

Pursuant to a purchase order contract with Shell, Berwick Bay provides diesel fuel, oils, greases, and lubricants as required by Shell. The purchase order contract provides in pertinent part as follows:

... Contractor [Berwick Bay] ... [shall furnish] ... all necessary tools and equipment, materials, ... labor and supervision ... to ... provide and deliver as required/requested No. 2 API or 45 Cetane diesel fuel ... and/or Shell branded oils, greases and lubricants on a first call basis as required to support Shell's exploration and production programs serviced by/out of Shell's Morgan City Terminal to include but not limited to the requirements for all drilling rigs, supply boats and crew boats owned by or operated under contract to Shell and all production platforms and/or gas plants and other production facilities located in the following production units: ...

Thus, this is a blanket contract whereby Berwick Bay agrees to sell and deliver and Shell agrees to purchase and receive, at

enumerated prices, all the fuel, oils, greases, and lubricants which Shell might require for a period of one year to fuel vessels engaged in maritime activities and to support other aspects of Shell's offshore exploration and production programs.[1]

The contract does not address matters preliminary to the performance of the contract. For example, it does not specify the method by which Berwick Bay shall transport fuel and greases to Shell's terminal. Though Berwick Bay could have used a truck to transport the fuel to its storage tanks, it chose to transfer the fuel by barge. Berwick Bay's fuel barge would moor at Shell's dock. The storage tanks were located in an open field next to the fuel transfer station, which was dockside. The fuel was pumped from Berwick Bay's barge, through the fuel transfer station, to the fuel storage tanks. The fuel was kept in the storage tanks until Shell issued a request for fuel, at which time the fuel was sold to Shell. Berwick Bay would pump the fuel from the storage tanks, through the fuel transfer station, and onto Shell's vessels for offshore use or for use by the vessels. Shell did not issue work orders for Berwick Bay to fill Berwick Bay's fuel storage tanks. Rather, Berwick Bay was responsible for doing so on its own in order to meet its contractual obligations to Shell. Shell had not requested or purchased the fuel being transferred at the time of plaintiff's accident.

The other lubricants which Berwick Bay furnished to Shell were containerized and stored at Berwick Bay's warehouse in Morgan City adjacent to Shell's terminal. When Shell issued a request for these lubricants, they were transferred from the warehouse to the vessels via forklift trucks.

The amount of diesel fuel Berwick Bay supplied to Shell far exceeded the amount of other lubricants supplied to Shell. All the diesel fuel and most of the other lubricants were used for offshore purposes.

*Jurisdiction*

The Court has federal question jurisdiction over the Jones Act and general maritime law claims asserted by plaintiff against Berwick Bay. Plaintiff's negligence and strict liability claims against Shell are based solely on state law, yet there is no diversity of citizenship between the parties. Nevertheless, the court has pendant-party jurisdiction over the state law claims because they arise from the same common nucleus of operative fact as the Jones Act and general maritime law claims. *See Feigler v. Tidex, Inc.*, 826 F.2d 1435 (5th Cir.1987). The Court has ancillary jurisdiction over the cross-claim asserted by Shell against Berwick Bay because it arises from the same transaction or occurrence as the main demand. F.R.Civ.P. 13(g).

*I. Whether, under the terms of the contract, Berwick Bay's duty to indemnify Shell was triggered by plaintiff's accident*

Berwick Bay argues that its contractual duty to indemnify Shell arises only when an accident occurs in connection with a work order issued pursuant to the blanket agreement (the purchase order contract). Berwick Bay was not operating under a work order at the time of the accident. Rather, Berwick Bay was filling its own fuel storage tanks in anticipation of selling the fuel to Shell. Therefore, Berwick Bay argues that its indemnity obligation was not triggered by the accident. However, Shell contends that an injury sustained while Berwick Bay is performing an obligation relating to the blanket agreement triggers Berwick Bay's duty to indemnify Shell.

■ This particular purchase order contract differs from the usual master service agreement which may or may not be followed by a work order, and which becomes a binding contract only upon the issuance of the work order. *See e.g., Matte v. Zapata Offshore Co.*, 784 F.2d 628, 630 (5th

---

1. Berwick Bay has been supplying fuel, oils, greases, and lubricants to Shell pursuant to the purchase order contract since it was executed

on September 30, 1983. The contract has been extended annually for periods of one year since its inception.

Cir.1986); *Page v. Gulf Oil Corp.*, 775 F.2d 1311, 1314 (5th Cir.1985). Here, Berwick Bay was obligated to deliver and Shell was obligated to purchase all the fuels, oils, greases, and lubricants which Shell required to conduct its exploration and production programs, though either party reserved the right to cancel the agreement by giving sixty days written notice. Therefore, the Court finds that the purchase order contract constitutes a binding contract between the parties and is not subject to a suspensive condition which renders it null under Louisiana law.[2] *See Id.*

Where the language of a contract is plain and unambiguous, parol evidence is inadmissible to prove the parties' intention at the time of contracting. Corbin on Contracts, Section 542. The plain wording of the purchase order contract requires the Court to hold that it contains an indemnity obligation. Page one, paragraph one of the purchase order agreement provides: "This Order, including the instructions and conditions on the reverse side hereof, shall constitute an agreement between [Berwick Bay] and [Shell] to ... provide and deliver as required/requested ... fuel, ... oils, greases, and lubricants...." The indemnity clause is printed on the reverse side of page one. It provides that Berwick Bay shall indemnify Shell for any claim "resulting from or in connection with the performance of this Order" by Berwick Bay.[3] Therefore, the Court finds that the phrase "this Order" in the indemnity clause refers to the purchase order contract and not to a specific work order issued pursuant thereto.

The Fifth Circuit jurisprudence broadly construes language similar to "resulting from" or "in connection with" as encompassing all activities reasonably incident to or anticipated by the principal activity of the contract. *Fontenot v. Mesa Petroleum Co.*, 791 F.2d 1207, 1214 (5th Cir.1986). The Court finds *Transcontinental Gas Pipe Line Corp. v. Mobil Drilling Barge*, 424 F.2d 684 (5th Cir.1970), *cert. denied*, 400 U.S. 832, 91 S.Ct. 65, 27 L.Ed.2d 64 (1970), similar to the case at bar. There, Transcontinental sued ODECO and Signal Oil for damage to one of its pipelines located on the seabed. The pipeline was damaged when ODECO was lowering a submersible drilling barge into position, preparatory work which ODECO was to perform pursuant to a contract with Signal. The district court denied indemnity, ruling that ODECO's operations under the indemnity contract "did not commence until the barge had been properly positioned over the precise spot designated by Signal." *Id.* at 690. The pipeline was damaged before the barge was in the position called for in the contract. The Fifth Circuit reversed the district court and held that the damage caused by submerging the barge into place was damage "arising out of or being incident to the operations of" ODECO within the meaning of the indemnity provisions in the contract. *Id.* at 691.

In the case at bar, Toby Jones was injured while performing work which was preparatory to the sale of diesel fuel to Shell. All the fuel Berwick Bay stored in its fuel storage tanks was to be sold to Shell. It is evident that Berwick Bay filled its fuel tanks in order to meet its obli-

---

**2.** This particular contract appears to fit the definition of a requirements contract under Louisiana law. *See* 1 Litvinoff, Obligations § 119 (1969).

**3.** Article 11 of the purchase order contract provides in pertinent part:
Except as stipulated above in this Article 11, and to the maximum extent permitted by applicable law (but no further), Contractor shall defend, indemnify and hold harmless SOI, its directors, employees, agents, and coventurers, against any loss, damage, claim, suit, liability, judgment and expense, including attorneys' fees and other costs of litigation, arising out of injury, disease or death of any persons or damage to or loss of any property (including, but not limited to, SOI's existing facilities) resulting from or in connection with performance of this Order by Contractor or its subcontractors even though caused concurrently by the negligence (of any kind or description) or fault of a party indemnified, but excepting when the injury, disease, death or damage is caused by the sole negligence of a party otherwise indemnified. SOI shall have the right, but not the duty, to participate in the defense of any such claim or suit with attorneys of its own selection without relieving Contractor of any obligations hereunder.

gations under the contract. The Court holds that plaintiff's accident arose in connection with the purchase order contract, thus triggering the indemnity provision therein.

## II. Whether the Louisiana Oilfield Anti–Indemnity Act applies to Shell's cross-claim for indemnity

 If Toby Jones was injured while performing a maritime obligation under the contract, admiralty law will govern the scope of Shell's cross-claim for indemnity. Indemnity agreements, even those which seek to indemnify a party for its own negligence, are enforceable under admiralty law. *Corbitt v. Diamond M. Drilling Co.*, 654 F.2d 329 (5th Cir.1981). However, if Toby Jones was injured while performing a nonmaritime obligation, Louisiana law rather than maritime law will limit the scope of contractual indemnity Shell may recover in its cross-claim. The Louisiana legislature, in passing the Louisiana Oilfield Anti–Indemnity Act, La.R.S. 9:2780, declared indemnity provisions which purport to indemnify a party for its own negligence null and void and against the public policy of Louisiana. Thus, the enforceability of the indemnity claim turns on a choice of law analysis. For the reasons set forth below, the Court concludes that Shell's indemnity claim arose from the performance of a nonmaritime obligation and that to the extent Shell seeks to be indemnified for its own negligence, the indemnity claim is unenforceable under Louisiana law.

 Whether a particular contractual obligation is maritime depends on the subject matter of the contract, not on the situs of its performance or execution. *Theriot v. Bay Drilling Corp.*, 783 F.2d 527, 538 (5th Cir.1986). Benedict on Admiralty sets forth the following guidelines to determine whether a contract is maritime.

> ... [T]he principal determinant which emerges from a long course of decisions is the relation which the cause of action bears to the ship, the great agent of maritime enterprise, and to the sea as a highway of commerce. A contract relating to a ship in its use as such, or to commerce or navigation on navigable waters, or to transportation by sea or to maritime employment is subject to maritime law ... whether the contract is to be performed on land or water....
>
> Maritime character ... does not attach to a contract merely because the services to be performed under the contract have reference to a ship, or to its business, or that the ship is the object of such services or that it has reference to navigable waters. In order that such character should attach there must be a direct and proximate juridical link between the contract and the operation of the ship, its navigation or its management afloat, ...

1 Benedict on Admiralty § 183, at 11–6, 11–7 (7th Ed.1987).

 Admiralty law recognizes that not all contracts can be neatly categorized as maritime or nonmaritime. Where the parties agree to perform maritime services in a primarily nonmaritime contract a "mixed contract" is formed. In that event, state law will apply to indemnity claims arising from the nonmaritime elements of the contract. Maritime law will apply only to indemnity claims arising from the performance of a maritime obligation. *Hale v. Co–Mar Offshore Corp.*, 588 F.Supp. 1212, 1215 (W.D.La.1984).

The only aspect of the purchase order contract which has a maritime flavor is the requirement that Berwick Bay supply fuel to Shell's vessels at the fuel station. The Court has found no recent cases defining the character of a blanket contract to supply fuel to vessels engaged in maritime activities. However, to the Court's knowledge, all the cases which have defined the nature of a fuel supply contract analogous to the contract at bar have held that such a contract is not maritime until the fuel is furnished to a particular vessel. The seminal case on this issue, *Steamship Overdale Co. v. Turner*, 206 F. 339 (E.D.Pa.1913), involved a contract between the owner of a line of steamships and a firm engaged in the sale of coal for a general supply of coal at certain prices, the quantity to be measured by the requirements of the steamship company for use by all its vessels. The

Court held that until the contract was executed, "[i]t had no reference to any particular maritime service or maritime transaction, nor to the navigation, business, or commerce of the sea." *Id.* at 341. However, admiralty jurisdiction would lie as to the coal delivered to a specified vessel.[4]

Turner was followed in *Garcia, et al. v. Warner, Quinlan Co.*, 9 F.Supp. 1010 (S.D. N.Y.1934), which held that a contract to sell and deliver all the fuel oil required by the vessels of a steamship company for one year is not a maritime contract as to any part that remains executory. Thus, admiralty was without jurisdiction over a suit against the seller for failure to supply oil to one of the steamship company's vessels. *Id.*

*Turner* was referred to with approval in *The Walter Adams Seaboard Fisheries Co. v. Piedmont & Georges Creek Coal Co.*, 253 F. 20 (1st Cir.1918), and *Terminal Shipping Co. v. Hamberg*, 222 F. 1020 (D.Md.1915). In *Seaboard Fisheries*, a coal company contracted with the charterer of nineteen fishing vessels to supply and deliver, f.o.b. at the coal company's pier, all the coal the nineteen vessels might require during the fishing season. The coal company placed the coal on board the vessels at its pier without knowing whether the coal was to be used by the vessel being loaded, by another vessel in the fleet, or by the fishing factories which the vessels were chartered to service. Though the issue before the Court was whether the coal company could assert maritime liens against the vessels, the Court's analysis recognized that if the agreement between the coal company and the charterer of the vessels "had covered no coal for factory use, and had been an agreement only for the furnishing of such coal as the nineteen vessels of its fleet might thereafter require during the season, [it could not] be regarded as maritime in character. It did not 'begin and end in the necessities of a particular vessel for her own voyage,' as a contract for supplies must in order to be within admiralty jurisdiction." *Id.* at 24 (citing *Turner*, 206 F. at 340). In *Terminal Shipping*, 222 F. 1020, which held that a contract to perform stevedoring services is a maritime contract, the Court, citing *Turner*, stated that an executory contract to furnish all the coal that certain ships may need at a particular port is not a maritime contract and that admiralty jurisdiction did not lie, even in personam, to award damages for its breach. *Id.* at 1021.

More recent cases also recognize that whether supplies are delivered to a specified vessel as opposed to a fleet of vessels affects the law governing the contract. In *Compania Argentina de Navegacion Dodero v. Atlas Maritime Corp.*, 144 F.Supp. 13 (S.D.N.Y.1956), the Court held that a contract to provide supplies to a particular vessel is a maritime contract. The court distinguished *Turner* and *Garcia*, because those cases involved blanket supply contracts where no particular vessel and no particular voyage was contemplated by the parties. *Cf. Gerard Construction,*

---

4. It appears that at the time *Turner* was decided, for a contract to be classified as maritime, it was "not enough that the contract [was] maritime as to some of its provisions—it must [have been] maritime in its entirety.... 'In cases of a mixed nature, it [was] not a sufficient foundation for admiralty jurisdiction that there ... involved some ingredients of a maritime nature. The substance of the whole contract must [have been] maritime.'" *The Walter Adams Seaboard Fisheries Co. v. Piedmont & Georges Creek Coal Co.*, 253 F. 20, 24 (1st Cir.1918) (quoting Story, J., in *Plummer v. Webb*, 4 Mason, 380, 19 Fed. Cas. No. 11,233). Courts now recognize mixed contracts (predominately nonmaritime contracts which contain severable maritime and nonmaritime obligations) and apply maritime law to the maritime obligations under the contract. *Hale*, 588 F.Supp. at 1215.

Nevertheless, the Court does not believe that this distinction in any way affects the authority of *Turner* on the issue before the Court. *Turner* held that a court sitting in admiralty does not have jurisdiction over an action for failure to deliver fuel pursuant to a blanket fuel supply contract until the contract is executed. Until the fuel is delivered to a specified vessel, the contract does not have a proximate nexus to a maritime activity. A close proximity to a maritime activity is also required under admiralty law as it exists today to designate a contractual obligation as maritime. *See* 1 Benedict on Admiralty § 183, at 11–6, 11–7 (7th Ed.1987). The Court finds that *Turner* is not only sound and persuasive, but also consistent with the current state of admiralty law.

*Inc. v. Motor Vessel Virginia,* 480 F.Supp. 488, 490 (W.D.Pa.1979) (Contracts to furnish supplies or accessories to a particular vessel are maritime in nature); *Houston–New Orleans, Inc. v. Page Engineering Company,* 353 F.Supp. 890, 898 (E.D.La. 1972) (Contracts to furnish supplies or accessories to a particular vessel are maritime in nature even though the supplier does not himself incorporate the product into the ships); *But see Puerto Rico Maritime Shipping Authority v. Leith,* 668 F.2d 46, 50 at n. 9 (1st Cir.1981) (Stating that whether a federal court has admiralty jurisdiction over an action involving a contract to supply fuel to a fleet of vessels as opposed to a specified vessel is an uncertain question of admiralty jurisdiction, but citing no authority to contradict *Turner* and *Garcia.*)

The Court finds that the purchase order contract between Berwick Bay and Shell is a mixed but primarily nonmaritime contract which contains severable maritime and nonmaritime obligations. A contract for an annual supply of fuels, oils, greases, and lubricants to operate drilling rigs, gas plants, and other production facilities is not inherently maritime. Even though the purchase order contract also required Berwick Bay to supply diesel fuel to Shell's supply boats and crewboats, and the amount of diesel fuel far exceeded the amount of other lubricants supplied to Shell, the contract retains its primary nonmaritime nature. As set forth in *Turner,* 206 F. 339, and its progeny, a blanket contract to supply fuel for use by a fleet of vessels engaged in a maritime activity is not a maritime contract as to any part that remains executory. However, once fuel is supplied to a particular vessel, the purchase order contract becomes executed as to that delivery. Only then is there a sufficient nexus to the operation of a ship or to transportation by sea to invoke admiralty jurisdiction and create a maritime obligation. *See Turner,* 206 F. 339; *Garcia,* 9 F.Supp. 1010. Thus, the purchase order contract in the case at bar does not give rise to a maritime obligation until the fuel is delivered to a particular vessel pursuant to a work order issued by Shell.

The Court is aware that at the time *Turner* was decided, vessels were fueled by coal which was packaged in containers and placed on the dock for loading onto the vessel. This system of loading is no longer utilized as vessels are now propelled by liquid fuel. Nevertheless, Berwick Bay's use of a barge to transport fuel to its fuel storage tanks does not create a maritime obligation under the contract.

The nature of Berwick Bay's contractual obligation is determined by examining the contract and the manner in which fuel is delivered to Shell's vessels. The contract does not contemplate the use of a vessel to furnish fuel to Shell. Had Berwick Bay used a vessel to transport fuel to Shell's vessels the contract at bar would be wholly maritime in nature. *See Navieros Oceanikos, etc. v. S.T. Mobil Trader,* 554 F.2d 43 (2nd Cir.1977); *Hellenic Lines Limited v. Gulf Oil Corp.,* 340 F.2d 398 (2nd Cir.1965); *Cf. Theriot v. Bay Drilling Corp.,* 783 F.2d 527 (5th Cir.1986) (A contract to supply equipment, services, and materials necessary for the drilling and completion of a well is a maritime contract where the main piece of equipment supplied is a vessel). Berwick Bay's use of a barge to keep its fuel storage tanks full only affects the nature of its obligation to the plaintiff, as it bestows upon him seaman's status and results in the application of maritime law to an action against his employer, Berwick Bay. Plaintiff's seaman's status does not control the nature of the contractual relationship between Berwick Bay and Shell. *See Lefler v. Atlantic Richfield Co., Inc.,* 785 F.2d 1341, 1343 (5th Cir.1986). For these reasons, the Court finds that Berwick Bay's obligation to Shell under the blanket fuel contract is akin to that found in *Turner* and *Garcia.*

The most recent decision of the Fifth Circuit Court of Appeals regarding the applicability of the Louisiana Oilfield Anti–Indemnity Act to a claim for contractual indemnity in a mixed but primarily nonmaritime contract is *Thurmond v. Delta Well Surveyors,* 836 F.2d 952 (5th Cir.1988). The indemnity agreement at issue in *Thurmond* was contained in a master service

contract between Gulf Oil Corporation (Gulf) and P & S Well Service, Inc. (P & S) wherein P & S agreed to perform wireline services for Gulf's offshore wells in the Delta areas of Louisiana. The master service contract was not a binding contract, but rather " 'provided the framework for subsequent contracts which were to result from verbal or written work orders....' " *Id.* at 953 (quoting *Matte v. Zapata Offshore Co.*, 784 F.2d 628, 630 (5th Cir.1986)). Thus, each work order established the binding contractual arrangement between the parties. *See Page v. Gulf Oil Corp.*, 775 F.2d 1311, 1315 (5th Cir.1985).

The master service contract provided that P & S furnish a self-propelled barge with wireline equipment mounted on the deck, a barge operator, Arnold Buras, and a helper, Roosevelt Thurmond. Buras and Thurmond both operated the barge and performed wireline services. Each day they rode in the barge to Gulf's Northwest Bay office where Gulf's field superintendent assigned the day's work.

The verbal work order which was issued on the day Thurmond was injured was described by the District Court as follows:

On March 8, 1983, Gulf sent Buras and Thurmond to establish a water injection rate for well JG Timelot B, 99D. In order to do this, Buras and Thurmond boarded the P & S wireline barge and navigated it to the designated well, which was located in Louisiana waters. In order to establish the water injection rate in this instance, the wireline barge was positioned next to the wellhead, the casing pressure was bled off, the well's tubing was connected to pumps mounted on the barge and water was pumped into the well formation. Because of the design of the particular well structure here involved, the task of determining an injection rate could only be performed on the wireline barge. Plaintiff was injured on the well jacket while bleeding the casing pressure....

Order and Reasons, dated August 5, 1986.

The District Court looked to the work order as the binding contract between the

parties. Based on *Theriot*, 783 F.2d 527, the Court held that the work order issued on the day Thurmond was injured was a maritime contract. The Court noted that Gulf was billed for the use of the vessel and the cost of the crew. Further, the Court found that P & S could not perform its wireline obligations without a wireline barge and a crew. Since an agreement to provide a vessel and a crew is a maritime contract and the wireline barge and crew were an integral part of the wireline services performed, the Court applied maritime law to Gulf's claim for contractual indemnity against P & S.

The Fifth Circuit Court of Appeals reversed the decision of the District Court and held that the indemnity provision was governed by state law. In its analysis, the Court first defined the principal obligation under the contract. The Court held that the contract's principal obligation was the performance of wireline services and that such services, being peculiar to the oil and gas industry, not maritime commerce, are nonmaritime in nature. *Thurmond* at 955. The Court agreed that the contract contained maritime obligations which were necessary to perform the wireline services, such as the use of a barge to transport the wireline equipment and the crew, but considered these maritime obligations merely incidental to the principal nonmaritime obligation under the contract—the performance of wireline services. Second, the Court determined whether the plaintiff was engaged in a maritime or nonmaritime obligation under the contract at the time he was injured. Since the plaintiff was injured while performing wireline services and, thus, was not performing a maritime obligation under the contract, such as one relating to the navigation or operation of the barge, the Court held that the suit arose out of the contract's principal nonmaritime obligation and applied state law to the indemnity claim against the wireline company.[5]

As set forth heretofore in this opinion, admiralty jurisdiction attaches to the pur-

**5.** The Fifth Circuit appeared to follow the two-step approach set forth by Judge Shaw in *Hale*

*v. Co–Mar Offshore Corp.*, 588 F.Supp. 1212 (W.D.La.1984) and *Home Insurance Co. v. Gar-*

chase order contract at bar only when fuel is being delivered to Shell's vessels pursuant to a work order issued by Shell. At the time of plaintiff's accident, a work order had not been issued. Rather, Jones was transporting fuel to Berwick Bay's fuel storage tanks in anticipation of selling the fuel to Shell. Jones had just checked the fuel gauge on the storage tanks and was returning to the barge when he slipped on the edge of Shell's dock and fell onto Berwick Bay's barge. Since Toby Jones was not performing a maritime obligation under the contract at the time of his injury, state law will govern Shell's indemnity claim against Berwick Bay.

The Court does not accept Shell's argument that *Thurmond* requires the application of maritime law to the indemnity claim because Toby Jones was injured while performing a traditional maritime activity, the loading and unloading of a vessel. *See Luvi Trucking, Inc. v. Sea–Land Services, Inc.,* 650 F.2d 371, 373 (1st Cir.1981). *Thurmond* explicitly requires that the plaintiff be engaged in a maritime obligation under the contract if maritime law is applied to an indemnity agreement in a mixed but primarily nonmaritime contract. The maritime *obligation* to Shell is missing in the indemnity claim at bar. Shell fails to realize that it is the invocation of federal admiralty jurisdiction which results in the application of admiralty substantive law rather than state law. *See State of Louisiana, ex. rel Guste v. M/V Testbank,* 752 F.2d 1019, 1031 (5th Cir.1985). Unless the contract contains a maritime obligation which the plaintiff is performing while he is injured, there is no basis for applying admiralty law to the claim for contractual indemnity.

Nor is *Thurmond* authority for the proposition that since Berwick Bay in practice used a vessel to fill its fuel storage tanks to meet its obligations under the contract, a maritime obligation is created. The work order in *Thurmond* required P & I to provide a barge and crew to perform wireline services. The invoices issued to Gulf con-

tained charges for the hourly use of the barge and the cost of the crew. In contrast, the purchase order contract does not require Berwick Bay to transport fuel to its fuel storage tanks by vessel. Nor was Shell billed for the cost of transporting the fuel. Thus, Berwick Bay's practice of transferring fuel to its storage tanks by barge does not create a maritime obligation to Shell.

Furthermore, the application of Louisiana law to the indemnity claim is consistent with the law governing the claims for which Shell seeks indemnity. The claims against Shell are based upon Louisiana negligence and strict liability theories. Plaintiff alleges that Shell was negligent in failing to properly inspect the dock for greases and in failing to provide a gangway to safely walk from the dock to the vessels. Plaintiff also alleges that Shell is strictly liable under La.Civ.Code Art. 2317 because the rubrail was defective as a safe walking surface and posed an unreasonable risk of harm to the plaintiff.

Though plaintiff attempted to assert a maritime tort action against Shell, the Court held that he could not. The Supreme Court has consistently ruled that "maritime jurisdiction does not embrace accidents on land or injuries inflicted to or on extentions of the land such as docks and piers." *Parker v. South Louisiana Contractors, Inc.,* 537 F.2d 113, 115 (5th Cir.1976). Toby Jones slipped in grease on the rubrail attached to the dock, an extension of land. Even though he fell onto a barge, Jones cannot assert a cause of action for a maritime tort. Under the test set forth in *Executive Jet Aviation, Inc. v. City of Cleveland, Ohio,* 409 U.S. 249, 93 S.Ct. 493, 34 L.Ed.2d 454 (1972), to invoke maritime jurisdiction for an accident which occurs over water it is necessary that "the wrong bear a significant relationship to traditional maritime activity." *Id.,* 409 U.S. at 268, 93 S.Ct. at 504. The Court finds no significant relationship between Shell's alleged negligence as a dock owner in failing to

*ber Industries, Inc.,* 588 F.Supp. 1218 (W.D.La. 1984), to determine when maritime law will be applied to indemnity claims arising out of mari-

time obligations in a mixed, but essentially nonmaritime contract.

provide a gangway or properly inspect the rubrail on the dock, an extention of land, and traditional maritime activity involving commerce or navigation on navigable waters.

Therefore, not only did Toby Jones's accident not arise from a maritime obligation under the contract as required by *Thurmond,* but plaintiff's claims against Shell for which Shell seeks indemnity are cognizable only under state law.

The Court holds that there are no questions of material fact and that, since plaintiff's injury did not arise from the performance of a maritime obligation under the contract, Berwick Bay is entitled to partial summary judgment as a matter of law.

Accordingly,

IT IS ORDERED that:

1) Shell's motion for partial summary judgment is DENIED;

2) Berwick Bay's motion for partial summary judgment is DENIED IN PART and GRANTED IN PART. Though plaintiff's injury arose in connection with the performance of the purchase order contract, the Louisiana Oilfield Anti–Indemnity Act shall determine the limits of contractual indemnity under the agreement.