UNION TEXAS PETROLEUM CORPORATION, Plaintiff,

v.

PLT ENGINEERING, INC., Defendants,

State Service Company, Inc., Defendant–Counter–Plaintiff,

POWER WELL SERVICE, INC. and Gulf Island–IV, a Louisiana Partnership, Intervenors–Appellees,

v.

UNION TEXAS PETROLEUM CORPO-RATION, Agip Petroleum Company and Minatome Corporation, Counter–Defendants–Appellants.

UNION TEXAS PETROLEUM CORPORATION, Plaintiff,

v.

PLT ENGINEERING, INC., et al., Defendants,

Brown and Root USA, Inc. and Sub Sea International, Inc., Defendants–Appellees,

and

State Service Company, Inc., Defendant–Counter–Plaintiff–Appellee,

Union Texas Petroleum Corporation, Agip Petroleum Company and Minatome Corporation, Counter–Defendants–Appellants.

Nos. 88–4823, 89–4118.

United States Court of Appeals, Fifth Circuit.

March 7, 1990.

---

Patrick W. Gray, Charles B. Griffis and George Arceneaux, III, Liskow & Lewis, Lafayette, La., for counter-defendants-appellants.

Robert J. Burvant and John T. Nesser, III, Nesser, King & LeBlanc, New Orleans, La., for intervenors-appellees.

Mitchell J. Hoffman, Lowe, Stein, Hoffman & Allweiss, New Orleans, La., for State Service Co.

Robert W. Daigle, Onebane, Donohoe, Bernard, Torian, Diaz, McNamara & Abell, Lafayette, La., for Sub Sea Intern.

Stewart F. Peck, Nathan P. Horner, Lugenhuhl, Burke, Wheaton, Peck & Rankin, New Orleans, La., for Brown & Root USA, Inc.

Before BROWN, REAVLEY, and HIGGINBOTHAM, Circuit Judges.

JOHN R. BROWN, Circuit Judge:

On this appeal from the entry of summary judgments, we hold that the Outer Continental Shelf Lands Act (OCSLA), 43 U.S.C. §§ 1331–56 (1986 and Supp. III 1989), requires the application of Louisiana state law to non-maritime contract disputes arising from the construction of a gathering line on the seabed of the outer Continental Shelf (OCS). We further hold that the subcontractors were entitled to assert liens against the project under the Louisiana Oil Well Lien Act (LOWLA), LSA–R.S. 9:4861 *et seq.* The availability of the liens was not defeated by the language of LOWLA or contract provisions. Thus we affirm the summary judgments in favor of the subcontractors.

### An Underwater Pipeline

Union Texas Petroleum Corporation (UTP) entered into an offshore construction contract with PLT Engineering, Inc. (PLT). PLT was to design, fabricate, and install a gas transportation system from a platform owned by UTP, and its partners[1] in the Vermilion Area Block 237 off the coast of Louisiana, to a side tap in the Bluewater Pipeline owned by Columbia Gulf Transmission Company and located in Vermilion Area Block 225. The platform and the pipeline at the point of the side tap are located on the OCS. The gas transportation system was built to function as a gathering line. The line is located in its entirety on the OCS. Completed, it belongs to UTP.

### The Contractual Network

In order to complete the gathering line, PLT entered into contracts with Brown & Root USA, Inc., State Service Company, Inc. and Sub Sea International, Inc. Additionally, State Service contracted with Power Well Service, Inc. and *Gulf Island IV*, a jack-up barge. Brown & Root, State Service, Sub Sea and Power Well are referred to collectively as the subcontractors. Brown & Root was contractually obligated to construct the pipeline by welding together joints of pipe supplied by PLT, to bury the line, and to lay the pipe close to the platform at one end and the Bluewater Pipeline at the other. Brown & Root performed labor and services and furnished materials, equipment and supplies includ-

1. Agip Petroleum Company and Minatome Corporation were sued along with UTP, however, for purposes of simplicity, the opinion refers to them collectively as UTP.

**1046**

ing a barge. After Brown & Root had laid the gathering line, State Service was to fabricate and install tap assemblies to connect it to the platform and the Bluewater Pipeline. State Service also did some burial and testing work using divers. It worked from vessels and chartered Power Well's *Gulf Island IV* in connection with its work on the project. Sub Sea provided inspection services performed by divers, to ensure that the other subcontractors complied with contractual specifications. Sub Sea provided vessels for these divers to work from. Most of the work done under the subcontracts took place on the ocean floor or on a riser on UTP's platform. Some vessels were used for transportation of men and facilities. Others afforded living facilities. The *Gulf Island IV* was used to fulfill contract obligations.

PLT eventually completed and tested the line. However, through communications with some of the subcontractors, UTP learned that PLT had not paid the subcontractors. Accordingly, UTP invoked the contract provision that allowed it to withhold money from the amount due under the contract with PLT. UTP withheld $420,045.59 then instituted an interpleader action under F.R.Civ.P. 22 to enable PLT and the subcontractors to determine how the money should be allocated among them. Each of the subcontractors answered and filed counterclaims asserting liens.

After cross motions for summary judgment, the trial court issued a Memoranda Ruling. It held that (i) LOWLA [2] was ap-

plicable, (ii) the choice of law provisions in the subcontracts [3] could not be enforced by UTP because of a lack of privity, (iii) federal admiralty law was not applicable because the activities involved were not traditionally maritime and thus OCSLA applied, and (iv) recordation requirements for the liens were sufficiently complied with by filing in adjacent parishes and with the Department of the Interior's Mineral Management Division. The trial court then dismissed the interpleader action as inappropriate since LOWLA was applicable. The district court retained jurisdiction under 43 U.S.C. § 1349(b)(1) and 28 U.S.C. § 1331. Eventually final judgments were entered in favor of each of the subcontractors.[4] Without challenging the correctness of the subcontractors' claims or the receipt of their value, UTP appeals from all aspects of the trial court's rulings.

### Breathing Salt Air

■ The trial court held that Louisiana law, rather than maritime law applied to these contracts by operation of the Outer Continental Shelf Lands Act (OCSLA). 43 U.S.C. §§ 1331–1356 (1986 & Supp III 1989). UTP argues that OCSLA cannot apply to work performed in a maritime setting on the high seas. It places a great deal of reliance on the recent Supreme Court decision in *Offshore Logistics, Inc. v. Tallentire*, 477 U.S. 207, 106 S.Ct. 2485, 91 L.Ed.2d 174 (1986). We agree with the trial court and hold that *Tallentire* does

---

**2.** The relevant provisions of LOWLA are cited and discussed, *infra*, in the section entitled "UTP Can't Sink LOWLA."

**3.** The subcontracts provided:
> If the work to be performed pursuant to this contract is conducted in whole or in part over the Continental Shelf or in navigable water then this contract shall be governed and construed in accordance with the General Maritime Laws of the U.S. If the work to be performed is conducted on land, then the laws of the State of Texas shall govern the provisions hereof.

Contract for Union Texas Petroleum Vermilion Pipeline Project Fabrication, and Installation of Pipeline, Exh. A, § 21.1 (Oct. 14, 1986) (contract by and between Brown & Root and PLT). Each contract contained this clause.

**4.** Power Well and *Gulf Island IV* received summary judgment in the undisputed amount of $93,551 plus 10% attorneys' fees and interest (with an accompanying decrease in State Service's lien) on May 17, 1988. R. 874–76. Brown & Root received summary judgment in the stipulated amount of $450,000 plus 10% attorneys' fees and interest along with some additional adjustments on Sept. 27, 1988. R. 1180–82. Sub Sea received summary judgment in the amount of $120,922.89 plus 10% attorneys' fees and interest on Dec. 14, 1988 (amending the order entered Mar. 14, 1988). R. 1281–83. State Service received summary judgment in the stipulated amount of $352,000 plus 10% attorneys' fees and interest on Jan. 19, 1989. R. 1292–94. These judgments were all made final and consolidated for appeal.

not impose the application of maritime law in this case.

OCSLA provides in pertinent part:

(1) The Constitution and laws and civil and political jurisdiction of the United States are hereby extended to the subsoil and seabed of the outer Continental Shelf and to all artificial islands, and all installations and other devices permanently or temporarily attached to the seabed, which may be erected thereon for the purpose of exploring for, developing, or producing resources therefrom, or any such installation or other device (other than a ship or vessel) for the purpose of transporting such resources, to the same extent as if the outer Continental Shelf were an area of exclusive Federal jurisdiction located within a State....

(2)(A) To the extent that they are applicable and not inconsistent with this subchapter or with other Federal laws and regulations of the Secretary now in effect or hereafter adopted, the civil and criminal laws of each adjacent State, now in effect or hereafter adopted, amended, or repealed are hereby declared to be the law of the United States for that portion of the subsoil and seabed of the outer Continental Shelf, and artifical islands and fixed structures erected thereon, which would be within the area of the State if its boundaries were extended seaward to the outer margin of the outer Continental Shelf....

43 U.S.C. § 1333(a) (1986).

■ *Rodrigue v. Aetna Casualty and Surety Co.,* 395 U.S. 352, 355–56, 89 S.Ct. 1835, 1837–38, 23 L.Ed.2d 360, 364 (1969), said:

The purpose of the Lands Act was to define a body of law applicable to the seabed, the subsoil, and the fixed structures ... on the outer Continental Shelf. That this law was to be federal law of the United States, applying *state law only as federal law* and then only when not inconsistent with applicable federal law, is made clear by the language of the Act. (Emphasis added.)

*Rodrigue* made clear that "for federal law to oust adopted state law, federal law must first apply." 395 U.S. at 359, 89 S.Ct. at 1839, 23 L.Ed.2d at 366. But for adjacent state law to apply as surrogate federal law under OCSLA, three conditions are significant. (1) The controversy must arise on a situs covered by OCSLA (i.e. the subsoil, seabed, or artifical structures permanently or temporarily attached thereto). (2) Federal maritime law must not apply of its own force. (3) The state law must not be inconsistent with Federal law. All of these conditions are met in this case.

UTP argues that all of the subcontractors' contracts for the building and completion of the pipeline called for services which were provided from vessels and by divers in the ocean, not on a platform, and therefore were not in areas covered by OCSLA. Perhaps in a more traditional approach, the contention comes down to an assertion that these collective contracts were maritime in nature and thus subject exclusively to admiralty law. On both grounds we disagree.

In the first place, the gathering line exactly fits the statutory definition of an "other device[ ] permanently or temporarily attached to the seabed ... erected thereon for the purpose of ... developing, or producing resources therefrom." 43 U.S.C. § 1333(a)(1). In addition, the gathering line was buried beneath the ocean floor. It was connected to a platform at one end. It was connected to a transmission line at the other. The locations where the substantial work was done were covered situses—the subsoil or seabed;[5] an artificial island;[6] and an installation for the production of

---

5. OCSLA extends the laws of the United States "to the subsoil and seabed of the [OCS]." 43 U.S.C. § 1333(a)(1). A line buried beneath the ocean floor is clearly covered. No party has disputed the fact that the gathering line lies, in its entirety, on the OCS.

6. In *Rodrigue,* the court described drilling rigs as "islands, albeit artificial ones." 395 U.S. at 360, 89 S.Ct. at 1839, 23 L.Ed.2d at 367. OCSLA extends "to all artificial islands ..." 43 U.S.C. § 1333(a)(1).

resources.[7] Thus the first condition is met.

Whether the second factor—that the activity be non-maritime—is present requires further analysis. In a definition highly oversimplified which would exclude a myriad of contracts obviously maritime, one authority stated, " '[t]he only question is whether the transaction relates to ships and vessels, masters and mariners, as the agents of commerce.... ' " *Kossick v. United Fruit Co.*, 365 U.S. 731, 736, 81 S.Ct. 886, 890, 6 L.Ed.2d 56, 61 (1961), *citing,* I Benedict, Admiralty 131.[8] The contracts at issue here were not maritime.

In its analysis of the legislative history surrounding OCSLA, *Rodrigue* reflects that Congress was aware that it had the power to treat activities on the artificial islands as though they had occurred aboard ship and were thus maritime and in fact a proposed bill did so. However, in passing the bill that ultimately became OCSLA, "Congress assumed that the admiralty law would not apply unless Congress made it apply, and then Congress decided not to make it apply." 395 U.S. at 361, 89 S.Ct. at 1840, 23 L.Ed.2d at 367. *Rodrigue* further explains that "the committee was acutely aware of the inaptness of admiralty law. The bill applied the same law to the seabed and subsoil as well as to the artificial islands, and admiralty law was obviously unsuited to that task." 395 U.S. at 364–65, 89 S.Ct. at 1841–42, 23 L.Ed.2d at 369 (footnote omitted).

The Fifth Circuit has likewise determined that "[i]n the context of contract disputes, the principle underlying *Rodrigue* and *Kimble* [v. Noble Drilling Co.,* 416 F.2d

847 (5th Cir.1969), *cert. denied,* 397 U.S. 918, 90 S.Ct. 924, 25 L.Ed.2d 99 (1970),] precludes the application of maritime law except in those cases where the subject matter of the controversy bears the type of significant relationship to traditional maritime activities necessary to invoke admiralty jurisdiction." *Laredo Offshore Constructors, Inc. v. Hunt Oil Co.,* 754 F.2d 1223, 1231 (5th Cir.1985).

Laredo's arguments were much akin to UTP's. It argued that (1) to perform contract obligations, many seamen and vessels had to be hired, and (2) the recovery of oil and natural gas from the seabed was a traditional maritime activity. The court there held:

> The contract involved here ... did more than charge Laredo with the responsibility of carrying workers and supplies to the well site. Laredo's principal obligation under the contract was the construction of a stationary platform, and, as Laredo conceded at oral argument, it is the alleged breach of this obligation that gave rise to the instant action. While the contract no doubt contemplated the hiring of vessels and seamen to build the structure, the subject of this case has no direct relationship with these traditional subjects of maritime law. It is fundamental that the mere inclusion of maritime obligations in a mixed contract does not, without more, bring nonmaritime obligations within the pale of admiralty law. That the contract contemplated in part the use of instruments of admiralty, therefore, is not sufficient to

---

7. OCSLA extends to "all installations and other devices permanently or temporarily attached to the seabed, which may be erected thereon for the purpose of ... producing resources therefrom." 43 U.S.C. § 1333(a)(1). "The term 'production' means those activities which take place after the successful completion of any means for the removal of minerals, including such removal, field operations, transfer of minerals to shore, ..." 43 U.S.C. § 1331(m). The Bluewater Pipeline meets these criteria.

8. True to the legal traditions of the sea, a more recent edition of *Benedict's* defines the maritime contract more broadly.

In matters of contract, the principal determinant which emerges from a long course of decisions is the relation which the cause of action bears to the ship, the great agent of maritime enterprise, and to the sea as a highway of commerce. A contract relating to a ship in its use as such, or to commerce or navigation on navigable waters, or to transportation by sea or to maritime employment is subject to maritime law and the case is one of admiralty jurisdiction, whether the contract is to be performed on land or water. 1 E. Jhirad, A. Sann, B. Chase & M. Chynsky, Benedict on Admiralty § 183, at 11-6 (7th ed. 1985) (cited in *Thurmond v. Delta Well Surveyors,* 836 F.2d 952, 954 (5th Cir.1988)).

oust OCSLA–adopted state law in this case.

*Id.* at 1231–32.

As much a grey horse case as any diligent scholar or the ubiquitous tentacles of LEXIS could uncover, our case is much the same. While some maritime operations were undoubtedly contemplated, the principal obligation of PLT and the subcontractors was to build the gathering line and connect it to the platform and the transmission line. These activities are not traditionally maritime. Rather they are the subjects of oil and gas exploration and production.

No subsequent case alters the result. In *Herb's Welding Inc. v. Gray,* 470 U.S. 414, 422, 105 S.Ct. 1421, 1426, 84 L.Ed.2d 406, 413 (1985), the Supreme Court reversed this court, finding that "[t]he history of the Lands Act at the very least forecloses the Court of Appeals' holding that offshore drilling is a maritime activity and that any task essential thereto is maritime employment for LHWCA purposes." [9]

UTP is afforded no comfort by *Theriot v. Bay Drilling Corp.,* 783 F.2d 527 (5th Cir. 1986), in which we stated that "[o]il and gas drilling on navigable waters aboard a vessel is recognized to be maritime commerce." *Id.* at 538–39. It is important that the cases relied on by the court in *Theriot* predated both *Laredo* and *Herb's Welding.*[10] Furthermore, in *Herb's Welding* the Supreme Court had specifically criticised the Fifth Circuit's "expansive view of maritime employment" which it found was not consistent with LHWCA cases. 470 U.S. at 423, 105 S.Ct. at 1427, 84 L.Ed.2d at 414.

Finally, we point out that *Theriot* was predicated on the theory that "[w]hether a particular contract can be characterized as maritime depends on the nature and character of the contract, not on the situs of its performance or execution." 783 F.2d at 538. While this has merit as a general proposition, "Congress determined that the general scope of OCSLA's coverage, ... would be determined principally by locale, not by the status of the individual injured or killed." *Offshore Logistics, Inc. v. Tallentire,* 477 U.S. 207, 219, 106 S.Ct. 2485, 2492, 91 L.Ed.2d 174, 188 (1986). Therefore, we construe *Theriot* narrowly and constrain it to its facts. Since no drilling on navigable waters from a vessel is involved here, *Theriot* is not controlling.

*Tallentire* does not in any way change our result. In it, two platform workers were killed when the helicopter which was transporting them from the platform to shore crashed into the sea. Recognizing that "[b]y its terms, OCSLA must be 'construed in such a manner that the character of the waters above the outer Continental Shelf as high seas ... shall not be affected,' § 1332(2)," the Court held that in contrast with the Death on the High Seas Act (DOSHA), OCSLA was not applicable. 477 U.S. at 217–19, 106 S.Ct. at 2491–92, 91 L.Ed.2d at 186–87. Critical to this holding was the Court's determination that,

admiralty jurisdiction is appropriately invoked here under traditional principles because the accident occurred on the high seas and in furtherance of an activity bearing a significant relationship to a traditional maritime activity. *See Executive Jet Aviation, Inc. v. City of Cleveland,* 409 U.S. 249, 93 S.Ct. 493, 34

---

**9.** As always, the lessons of prior cases must be applied in deciding new cases that arise under different statutes. Under the Longshore and Harbor Workers' Compensation Act (LHWCA), 33 U.S.C. §§ 901–950, coverage may extend beyond admiralty's boundaries. However, the threshold question under both LHWCA and OCSLA is: does the dispute arise out of traditional maritime activity? Thus, while the LHWCA was not intended to "cover all those who breathe salt air," neither was OCSLA intended to exclude them all. *See Herb's Welding, Inc. v. Gray,* 470 U.S. 414, 423, 105 S.Ct. 1421, 1427, 84 L.Ed.2d 406, 414 (1985).

**10.** The court relied on *Pippen v. Shell Oil Co.,* 661 F.2d 378, 384 (5th Cir.1981); *Boudreaux v. American Workover, Inc.,* 664 F.2d 463, 466 (5th Cir.1981), *reh'g en banc,* 680 F.2d 1034 (5th Cir.1982), *cert. denied,* 459 U.S. 1170, 103 S.Ct. 815, 74 L.Ed.2d 1014 (1983). The continued validity of these cases has not been tested in light of *Herb's Welding.* The court distinguished *Herb's Welding,* 783 F.2d at 539, n. 11, reading it as holding only that "not every worker performing a task in oil and gas production from fixed platforms is engaged in maritime employment."

L.Ed.2d 454 (1972). Although the decedents were killed while riding in a helicopter and not a more traditional maritime conveyance, that helicopter was engaged in a function traditionally performed by waterborne vessels: the ferrying of passengers from an "island," albeit an artificial one, to the shore. 477 U.S. at 218–19, 106 S.Ct. at 2492–93, 91 L.Ed.2d at 187. In other words, the Supreme Court found in *Tallentire* that (1) the accident did not occur at an OCSLA situs—it took place miles away from the platform where the decedents worked over the open sea, and more than that, (2) federal maritime law did apply of its own force to the loss of two lives in the ocean, a classic case of maritime jurisdiction. *Tallentire* did not change the law, it merely followed it.

Whatever doubt could remain—and we can conjure up none—is dispelled by *Thurmond v. Delta Well Surveyors*, 836 F.2d 952, 955 (5th Cir.1988), which following *Herb's Welding* stated that "[t]he principal obligation under this contract was to perform wireline services, clearly a nonmaritime obligation in the sense that it does not concern the operation of the vessel. Such services are peculiar to the oil and gas industry, not maritime commerce."

■ Because the contracts at issue were nonmaritime, OCSLA came into force so that Louisiana state law applies to the claims for liens regardless of whether a particular service supplied would be maritime (e.g. charter hire).

### Submerging (Not Drowning) Louisiana Law

■ UTP argues that even if OCSLA applies, the parties have chosen admiralty law through the choice of law provisions in their contracts.[11] This argument can not prevail.

Although Louisiana's choice of law rules might enforce this choice of law provision, OCSLA will not. We find it beyond any doubt that OCSLA is itself a Congressionally mandated choice of law provision requiring that the substantive law of the adjacent state is to apply even in the presence of a choice of law provision in the contract to the contrary. *See Matte v. Zapata Offshore Co.*, 784 F.2d 628, 631 (5th Cir.), *cert. denied*, 479 U.S. 872, 107 S.Ct. 247, 93 L.Ed.2d 171 (1986); *Wooton v. Pumpkin Air, Inc.*, 869 F.2d 848, 852 (5th Cir.1989); *see also Gulf Offshore Co. v. Mobil Oil Corp.*, 453 U.S. 473, 482 n. 8, 101 S.Ct. 2870, 2877 n. 8, 69 L.Ed.2d 784, 794 n. 8 (1981) ("OCLSA does supercede the normal choice-of-law rules that the forum would apply."); *Chevron Oil Co. v. Huson*, 404 U.S. 97, 102–03, 92 S.Ct. 349, 353–54, 30 L.Ed.2d 296, 303 (1971).

### UTP Can't Sink LOWLA

LOWLA is available for all of the subcontractors. Now embracing LOWLA, UTP asserts three reasons against the availability of lien rights under the facts of this case. (1) By the letter of LOWLA, the subcontractors are not entitled to assert liens. (2) The recordation requirements of LOWLA cannot be complied with hence liens are not available. (3) The right to assert liens was waived by the choice of law provisions in the subcontracts. We disagree with all of these arguments and hold that the subcontractors were entitled to assert liens, they were properly recorded, and their right to assert liens was not waived.

■ First, LOWLA expressly provides for a lien privilege in favor of

[a]ny person who performs any labor or service in drilling or in connection with the drilling of any well or wells in search of oil, gas or water, or who performs any labor or service in the operation or in connection with the operation of any oil, gas or water well or wells, or performs any labor or service in the construction, operation, or repair or in connection with the construction, operation, or repair of any flow lines or gathering lines, regardless of their length, which are attached to or connected with the oil, gas or water well or wells, and any pipeline owned by

---

**11.** *See supra* note 3.

the producer, operator or contract operator of the well....

LSA–R.S. 9:4861(A) (emphasis added). The privilege is in all the oil or gas produced from the well or the proceeds thereof or any equipment, lines or other appurtenances on the lease. *Id.*

The argument in this regard is largely grammatical. For example, UTP argues that in order to have a lien privilege arising out of the construction of a gathering line, the gathering line must connect to both a well and a pipeline owned by the owner of the well. In other words, they read a common ownership requirement into the statutory provision. Such a requirement, if it existed, would not be met in our case because the well is owned by UTP while the transmission line, the Bluewater Pipeline, is owned by Columbia Gas Transmission.

The comma after "well or wells" and before "and any pipeline" serves no grammatical function under UTP's theory. Under the subcontractors' theory, which we adopt, it sets off the phrase "which are attached to or connected with the oil, gas or water well or wells." The phrase thus modifies gathering line and flow line. We agree that the comma clearly establishes two classes of pipelines from which a lien might arise: (1) flow lines or gathering lines connected to the well and (2) pipelines owned by the well owner.

This provision of LOWLA was amended in 1984. Those amendments clearly incorporated the prior cases [12] and now mandate that those who construct gathering lines which are connected to a well have a lien privilege.

■ Second, the liens were properly recorded. The statute provides:

> To preserve the privilege granted by R.S. 9:4861, a notice of such claim or privilege, setting forth the nature and amount thereof, shall be filed for record

and inscribed in the mortgage records of the parish where the property is located. LSA–R.S. 9:4862(A)(1). UTP argues that this requirement was not complied with because the well (the property) is located on the OCS. Because the well is not located within the former physical boundaries of a parish, the liens could not be recorded "in the parish where the property is located."

UTP places some reliance on our *St. Mary* cases. *St. Mary Iron Works, Inc. v. McMoran Exploration Co.*, 802 F.2d 809 (5th Cir.1986), *vacated* 809 F.2d 1130 (5th Cir.1987). However, the second *St. Mary* decision explicitly refused to answer the question at issue here. There the court said, "[w]e leave the question of whether this statute has any effect on the interaction of the Lands Act and Louisiana law to another day." 809 F.2d at 1135, n. 5. This is "another day."

If 9:4862 were to be read as UTP urges, to allow liens to be recorded only if the property is located on *land* in a parish, it would deny the subcontractors the protection of Louisiana law merely because their work was performed on the OCS rather than on shore. At the least, this would frustrate the Congressional intent behind OCSLA that state law operate as surrogate federal law on the OCS. It would be anomalous to deny the liens here when a principal reason for adopting state law to apply as federal law on the OCS was to protect all those who perform activities including providing services and materials on the OCS.[13] *See, e.g., Chevron Oil Co. v. Huson,* 404 U.S. 97, 103–04, 92 S.Ct. 349, 353–54, 30 L.Ed.2d 296, 303–04 (1971); *Wooton v. Pumpkin Air, Inc.,* 869 F.2d 848, 851 (5th Cir.1989).

The combination of both OCSLA and Louisiana law extend Vermilion parish beyond the location of the work done here. Louisiana law provides that,

> the gulfward boundary of all said coastal parishes extend coextensively with the

---

**12.** *See, e.g., Continental Casualty Co. v. Associated Pipe & Supply Co.,* 447 F.2d 1041 (5th Cir. 1971) (distinguishing between gathering lines and transmission lines); *McGee v. Missouri Valley Dredging Co.,* 182 So.2d 764, 767 (La.App. 1st Cir.1966).

**13.** See in contrast the treatment of workers compensation liabilities which for OCSLA purposes are covered by the LHWCA territorial extension. *See* 43 U.S.C. § 1333(b).

gulfward boundary of the State of Louisiana.

LSA–R.S. 49:6. OCSLA adopts this state law and extends the boundaries of Vermilion parish to the outer limits of the OCS by providing that state law applies to the subsoil and seabed of the OCS and all artificial islands thereon "which would be within the area of the State if its boundaries were extended seaward to the outer margin of the outer Continental Shelf...." 43 U.S.C. § 1333(a)(2)(A). Thus the liens were actually filed in the parish where the property is located.

Any other result here would frustrate the Congressional purpose that the OCS be treated as an area of exclusive federal jurisdiction within the state where state law will apply to fill in the gaps in the federal law. *Brown & Root v. Prosper Energy*, Civ. Action No. 87–0343 (E.D.La. June 29, 1987) (unpublished).[14]

■ Third, the subcontractors did not waive their lien rights. UTP argues that the subcontractors all waived their rights to assert liens under Louisiana law because of a provision in each of their contracts that UTP contends made the project "lien free."

Neither the final payment nor any part of the retention, if any, provided for in Exhibit E to the Contract shall become due until CONTRACTOR delivers to COMPANY a complete release or waiver of all liens arising or which may arise out of this Contract or as to the Work or any part thereof, or receipts in full in lieu thereof and, if requested by COMPANY, an affidavit that so far as CONTRACTOR has knowledge or information the releases and receipts include all labor, material, and services for which a lien could be filed upon the pipeline against the COMPANY. CONTRACTOR shall indemnify and hold harmless the COMPANY from all liens and other encumbrances against the Work and any claims or actions on account of debts or claims with respect to the Work alleged to be due from CONTRACTOR or its subcontractors and suppliers to any person including subcontractors and suppliers, and will defend at its own expense any claim or litigation in connection therewith. The provisions of this Section 11.-1.2 shall survive the termination or expiration of this Contract.[15]

Even if remotely valid under Louisiana law[16] (which we need not determine) we

**14.** The *Brown & Root* case, involving the question of whether recordation in the coastal parishes adjacent to the mineral lease satisfied 9:4862, was remarkably similar to ours. We repeat with approval a portion of that opinion.

The defendants concede that if the pipeline built by the plaintiff were located on land or within the waters of the state of Louisiana the lien sought by plaintiff would attach. However, they contend that because the property against which the lien is sought in this case is not located in a parish, there is no place in which to record the lien as required by La. Rev.Stat.Ann. 9:4862 and that therefore no lien exists. *Cf. St. Mary Iron Works, Inc. v. McMoran Exploration Co.*, 802 F.2d 809, 813–14 (5th Cir.1986) *vacated on reh'g*, 809 F.2d 1130 (5th Cir.1987).

The recording requirement of La.Rev.Stat. Ann. § 9:4862 restricts the applicability of the LOLA to property located in the parishes of the state of Louisiana. That restriction, however, is contrary to the Congressional mandate that state law apply on federal lands on the Outer Continental Shelf. *Rodrigue*, 395 U.S. at 357 [89 S.Ct. at 1838]; *cf. Chevron Oil Co. v. Huson*, 404 U.S. 97 [92 S.Ct. 349, 30 L.Ed.2d 296] (1971).

To protect laborers, materialmen and contractors and to encourage development of mineral resources Louisiana law has provided for oilfield liens since 1916. *See generally Louisiana Materials Co. v. Atlantic Richfield Co.*, 493 So.2d 1141, 1146–48 (La.1986). The defendant's view of this case denies the protection of Louisiana's lien laws to those providing oilfield services only because the services were provided to oilfield operators in federal territory. In passing the OCSLA, Congress intended exactly the opposite result. *See Rodrigue*, 395 U.S. at 356–58 [89 S.Ct. at 1837–38]; *cf. St. Mary*, 802 F.2d 809, 815 (5th Cir.1986), *vacated on other grounds*, 809 F.2d 1130 (5th Cir.1987) (applying the Louisiana Private Works Act on the Outer Continental Shelf).

**15.** Contract for Union Texas Petroleum Vermilion Pipeline Project Fabrication, and Installation of Pipeline, Exh. A, § 11.1.2 (Oct. 14, 1986) (contract by and between Brown & Root and PLT) (emphasis added). Each contract contained a like clause.

**16.** Louisiana law allows parties to waive their lien rights. *Wardlaw Brothers Garage, Inc. v.*

reject UTP's construction that no liens were to attach to the project. This provision expressly contemplates that liens might arise on the project. It merely says that they are to be released or waived before final payment is made. The reservation of indemnity not only refers specifically to "liens" but it would be wholly ineffectual under UTP's construction in the usual commercial setting where potential liens arise on the default or insolvency of the contractor.

Finding no waiver of liens, we need not reach UTP's argument that it is a third party beneficiary of the subcontracts.

### Conclusion

Thus UTP fails on all its contentions. The District Judge was correct.

AFFIRMED.

*Thomas,* 19 La.App. 241, 140 So. 108 (La.App. 2d Cir.1932); *Babineaux v. Grisaffi,* 180 So.2d 888 (La.App. 3d Cir.1965). However, that waiver must be clearly indicated. *Bank of Jena v.*

*Rowlen,* 370 So.2d 146 (La.App. 3d Cir.1979) ("materialman's lien may be waived expressly or by implication where there is a strong factual basis").