**SEA ROBIN PIPELINE CO.**

v.

**RED SEA GROUP, LTD., et al.**

**Civil Action No. 94–2107–L.**

United States District Court,
W.D. Louisiana,
Lafayette Division.

March 19, 1996.

---

Patrick W. Gray, Liskow & Lewis, Lafayette, LA, Donald R. Abaunza, Cheryl M. Kornick, Liskow & Lewis, New Orleans, LA, for Sea Robin Pipeline Co., Cockrell Oil & Gas LP, Pogo Producing Co., Pennzoil Exploration Production Co., Mobil Oil Corp., Edisto Exploration Production Co., Sonat Exploration Co., Alma Energy Corp., KE Resources Ltd., Tenneco Ventures Corp.

G. Timmons Alexander, III, Mouton & Alexander, Lafayette, LA, for Neches Gulf Marine Inc., Neches Gulf Offshore Inc., and Neches Gulf Ship Services Inc.

Louis Simon, II, Henry H. LeBas, Laborde & Neuner, Lafayette, LA, for Harold Magee Inc.

Ralph E. Kraft, George D. Ernest, III, Preis Kraft & Roy, Lafayette, LA, for Big Inch Marine Systems Inc.

William B. Schwartz, Burke & Mayer, New Orleans, LA, for Falgout Marine Inc.

Charles M. Steen, Stephanie G. McShane, Phelps Dunbar, New Orleans, LA, for Wimpol Inc.

### RULING

NAUMAN S. SCOTT, District Judge.

Before the Court are Sea Robin Pipeline Company's Motion for Summary Judgment, Harold McGee, Inc.'s Cross–Motion for Summary Judgment and Opposition to Sea Robin's Motion for Summary Judgment, and Falgout Marine, Inc.'s Cross–Motion for Summary Judgment.

### FACTS

The dispute before the Court arises from a contractual relationship between Sea Robin Pipeline Company ("Sea Robin") and International Diving & Consulting Services, Inc. ("International Diving"). Sea Robin is the owner and operator of a 438–mile dual phase pipeline network located primarily in the Gulf of Mexico, offshore Louisiana.

In May of 1994, Sea Robin hired International Diving to perform certain abandonment procedures on two pieces of pipe within its integrated pipeline system located on the Outer Continental Shelf. Specifically, Sea Robin and International Diving entered into

a contract ("the Contract") for the abandonment and removal of certain sections of two pieces of Sea Robin's pipeline—its Ship Shoal Block 225 "C" Pipeline ("225 Pipeline") and its East Cameron Block 270 "A" Pipeline ("270 Pipeline"). The 225 Pipeline and 270 Pipeline are 1.5 miles long and 12.8 miles long, respectively, and they both have 20-inch diameters. The 225 Pipeline extends from the Ship Shoal Block 225 "C" Platform owned by Sonat Exploration Company to a subsea tap connection with Sea Robin's 20-inch pipeline in Ship Shoal Block 222. Sea Robin's 270 Pipeline extends from the Pennzoil Exploration & Producing Company's East Cameron Block 270 "A" Platform to Sea Robin's junction platform in East Cameron Block 265.

Pursuant to the Contract, International Diving was obligated to pay its suppliers and subcontractors, and to keep the property upon which the work was performed free from all liens arising out of the performance of the work or materials furnished in conjunction therewith. Furthermore, International Diving was obligated to indemnify Sea Robin for all liens against its property and for all suits by its suppliers and subcontractors against Sea Robin. In addition, Section 16.1 of the Contract required International Diving to provide Sea Robin with a bond to assure that International Diving's subcontractors and vendors would be paid. In accordance with this provision of the Contract, International Diving provided a bond (the "Bond") issued by Red Sea Group, Ltd., acting through its agent, Individual Surety. The Bond bound Red Sea and Individual Surety to act as surety for all of International Diving's obligations under the Contract, including, but not limited to, all claims of third parties and all other claims and liabilities which International Diving undertakes and agrees in the Contract to pay. The Bond also provided that all persons who have furnished labor or material for use in or about the Contract shall have a direct right of action upon this bond, subject to the obligee's priority.

International Diving completed its work under the Contract in July of 1994. Afterwards, Sea Robin received notice from some of International Diving's suppliers and subcontractors that they had not received payment for services and/or supplies rendered in conjunction with work conducted on the pipeline. Among the suppliers and subcontractors that noted outstanding obligations are: Falgout Marine, Inc. ("Falgout"), Harold McGee, Inc. ("McGee") and Neches–Gulf Marine, Inc., Neches–Gulf Offshore, Inc. and Neches–Gulf Ship Services, Inc. (collectively "Neches–Gulf"). Falgout provided a tug for towing services performed in connection with the abandonment procedures on Sea Robin's 225 Pipeline and 270 Pipeline; McGee furnished a tank barge, tug and other equipment relating to its barging services for modification of Sea Robin's 225 Pipeline and 270 Pipeline; and Neches–Gulf furnished various services and equipment to International Diving in connection with the abandonment of Sea Robin's 270 Pipeline.

After receiving notification of the delinquencies, Sea Robin filed an action in November of 1994 seeking a declaratory judgment against Red Sea and Individual Surety to clarify their rights and obligations under the Bond. In the action, McGee and Falgout intervened, stating causes of action against the named defendants under rights created by the Bond, and against plaintiff, Sea Robin, on the grounds that the intervenors acquired a lien on, among other things, Sea Robin's pipelines. In a separate action dated May 1995, Neches–Gulf filed a claim against Sea Robin, also asserting a lien on Sea Robin's pipelines. In both suits motions and cross-motions were made for summary judgment to determine the validity of the liens asserted against Sea Robin. The suits were consolidated, and the common question as to the validity of all the liens asserted against Sea Robin were before this Court. While the motions were pending, Sea Robin and Neches–Gulf settled their dispute, so now only the motions and cross-motions involving Falgout and McGee remain before this tribunal.

### LEGAL ANALYSIS

 The Federal Rules of Civil Procedure establish the applicable standard for summary judgment. Rule 56(c) of the rules requires the entry of summary judgment "if

the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The requirement is that "there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) (emphasis in original). A fact is "material" if proof of its existence or non-existence would affect the outcome of the lawsuit under the law applicable to the case. *Id.* at 248, 106 S.Ct. at 2510. An issue of material fact is "genuine" if the evidence is such that a reasonable jury might return a verdict for the non-moving party. *Id.* at 257, 106 S.Ct. at 2514–15. Once the party moving for summary judgment has satisfied its burden, then the non-moving party is required to go beyond the pleadings by way of affidavits, depositions, answers to interrogatories, etc., in order to demonstrate specific material facts which give rise to a genuine issue. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324–25, 106 S.Ct. 2548, 2553–54, 91 L.Ed.2d 265 (1986); *Anderson*, 477 U.S. at 250, 106 S.Ct. at 2511. The burden demands more than a mere showing of some metaphysical doubt as to the material facts. It requires the non-moving party to advance "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588, 106 S.Ct. 1348, 1356–57, 89 L.Ed.2d 538 (1986). If the non-moving party fails to meet its burden, then summary judgment must be entered in favor of the moving party as a matter of law.

## I.

The liens asserted against Sea Robin are premised on the Louisiana Oil, Gas and Water Well Lien Act ("the Lien Act"), which bestows a lien in favor of persons who perform work or furnish supplies in connection with the drilling or operation of oil, gas and water wells. Sea Robin asserts three defenses in the alternative: (1) that the Lien Act is inapplicable, (2) that the facts do not support a lien under the Lien Act, and (3) that the lien claimants failed to preserve their liens. We address each defense in sequence.

First, Sea Robin contends the issues in this case, which arise from work performed on the Outer Continental Shelf, are governed by federal maritime law, not state law. Sea Robin would prefer that state law be inapplicable to the case because then it would not be subjected to the Louisiana Oil, Gas and Water Well Lien Act—a state statute. It is clear that the Outer Continental Shelf Lands Act ("OCSLA") governs issues arising from activities on the Outer Continental Shelf, and thus, the Lien Act applies, if at all, by operation of the OCSLA. The OCSLA provides in pertinent part:

(1) The Constitution and laws and civil and political jurisdiction of the United States are hereby extended to the subsoil and seabed of the outer Continental Shelf and to all artificial islands, and all installations and other devices permanently or temporarily attached to the seabed, which may be erected thereon for the purpose of exploring for, developing, or producing resources therefrom, or any such installation or other device (other than a ship or vessel) for the purpose of transporting such resources, to the same extent as if the outer Continental Shelf were an area of exclusive Federal jurisdiction located within a State ...

(2)(A) To the extent that they are applicable and not inconsistent with this subchapter or with other Federal laws and regulations of the Secretary now in effect or hereafter adopted, the civil and criminal laws of each adjacent State, now in effect or hereafter adopted, amended, or repealed are hereby declared to be the law of the United States for the portion of the subsoil and seabed of the outer Continental Shelf, and artificial islands and fixed structures erected thereon, which would be within the area of the State if its boundaries were extended seaward to the outer margin of the outer Continental Shelf ...

43 U.S.C. § 1333(a) (1986). Under the OCSLA, state law applies "only as federal law and then only when not inconsistent with applicable federal law." *Union Texas Petroleum Corp. v. PLT Engineering, Inc.*, 895 F.2d 1043, 1047 (5th Cir.1990), *cert. denied,*

498 U.S. 848, 111 S.Ct. 136, 112 L.Ed.2d 103 (1990) (quoting *Rodrigue v. Aetna Casualty & Surety Co.,* 395 U.S. 352, 355–56, 89 S.Ct. 1835, 1837, 23 L.Ed.2d 360 (1969)). For determining when adjacent state law applies as surrogate federal law under OCSLA, the Fifth Circuit focuses on three conditions: (1) whether the controversy arises on a situs covered by OCSLA, (2) whether federal maritime law applies by its own force, and (3) whether the state law is inconsistent with Federal law. *Union Texas Petroleum v. PLT Engineering,* 895 F.2d 1043, 1047 (5th Cir.1990). Sea Robin attempts to exploit the second condition—that the maritime law apply by its own force—by defining the controversy as one spawning from a maritime contract.

The *Union Texas* decision, *supra,* is instructive. In addressing the issue of whether maritime law applies of its own accord so as to preempt the application of the Lien Act, the *Union Texas* court looked to the principal obligation of the party claiming the lien and determined whether the activities performed by that party were traditionally maritime. *Id.* at 1047. In the case, Union Texas Petroleum contracted for PLT Engineering to design, fabricate and install a pipeline from a platform off the coast of Louisiana. PLT Engineering, in turn, subcontracted for other firms to provide barging, welding and other services necessary to perform the contract. Union Texas argued that the contracts were maritime because building and completion of the pipeline required services from vessels and by divers. Rejecting the argument, the Fifth Circuit held that the principal obligation of PLT Engineering and the subcontractors was construction of a pipeline related to oil and gas exploration, a nonmaritime activity governed by the Lien Act as surrogate federal law under the OCS-LA. *Id.* at 1049. *See, also, Thurmond v. Delta Well Surveyors,* 836 F.2d 952 (5th Cir. 1988) (holding that services under a contract were peculiar to the oil and gas industry, not maritime commerce); *Gardes Directional Drilling v. U.S. Turnkey Exploration,* 899 F.Supp. 287 (W.D.La.1995). In light of the foregoing precedent, we find that the construction and repair of Sea Robin's 225 and 270 Pipelines are, like the activities per-

formed in *Union Texas,* related to oil and gas exploration, not maritime commerce.

Sea Robin asserts that *Theriot v. Bay Drilling Corp.,* 783 F.2d 527 (5th Cir.1986), which we note was construed narrowly and constrained to its facts by the *Union Texas* court, should control our decision instead. We beg to differ. *Theriot* involved a slip and fall aboard a drilling barge owned by Bay Drilling. In the case, the plaintiff sued Bay Drilling, who then brought a third party action for indemnity under its drilling contract against the operator of the oil and gas lease. The issue before the court was whether the indemnity provision should be construed under state law or maritime law. The *Theriot* court concluded that the contract was maritime in nature, and therefore, maritime principles of contract construction should control the interpretation of the employment contract. *See Id.* at 538 (emphasizing that the drilling barge was the focus of the contract).

The import of *Theriot* is that the transportation of drilling vessels on navigable water constitutes maritime commerce—a principle that this court has long embraced. In *Kilgore Towing, Inc. v. U.S. Turnkey Exploration, Inc.,* No. 89–1457–LC (W.D.La. Feb. 7, 1991) for example, the defendant had contracted for Kilgore Towing to provide three of its barges for the towing of a mobile drilling rig over the surface of the Gulf of Mexico. This court determined that the towing of a mobile drilling barge is clearly a maritime activity. The line of cases recognizing the maritime nature of transporting movable drilling vessels, however, is inapposite. The present case does not deal with a moveable drilling platform. Rather, the structure at issue is fixed. *Cf. Union Texas,* 895 F.2d at 1047 (reasoning that the Outer Continental Shelf Lands Act applies to devices permanently or temporarily attached to the subsoil or seabed); see *Kilgore Towing, Inc. v. U.S. Turnkey Exploration, Inc.,* No. 89–1457–LC (W.D.La. Feb. 7, 1991). Furthermore, the services involved in the present case bear no relation to the transportation of the drilling structure. Instead, the Contract involves the construction and repair of pipelines that attach to the drilling appara-

tus—a relationship akin to the exploration of oil and gas, not to maritime commerce. Therefore, state law including the Lien Act applies.

## II.

■ Sea Robin's second defense is that the Lien Act does not extend to the pipelines at issue. The Lien Act grants a lien privilege to:

> any person who does any trucking, towing or barging ... for or in connection with the drilling of any well ... or for or in connection with the construction, operation or repair of any flow lines or gathering lines, ... and any other pipeline owned by the producer, operator, or contract operator of the well or wells.

La.R.S. 9:4861 (1984). Under the Act, a lien may be claimed on a pipeline if: (1) a person performs the types of services contemplated by the act, (2) the services are performed on the types of pipelines covered by the act, and (3) the services performed have the requisite connexity to the pipelines. There is no question here that Falgout and McGee are persons performing the types of services contemplated by the act. Nor is there a tenable challenge to the connection the services have to the pipelines at issue. *Cf. Phillips Petroleum Co. v. Best Oilfield Servs.*, 48 F.3d 913, 916 (5th Cir.1995) (stating that the phrase "for or in connection with" is to be liberally construed). The only real issue presented is whether the pipelines themselves are of the type burdened by the Act.

The Lien Act establishes two classes of pipelines from which a lien might arise: (1) flow lines or gathering lines connected to the well and (2) pipelines owned by the well owner. *Union Texas*, 895 F.2d at 1051. The latter class is clearly inapplicable in the present case because Sea Robin has no ownership interest in either well to which its pipes connect. The well that connects to the 270A line is owned by the Pennzoil Exploration & Producing Company and the well that connects to the 225C line is owned by the Sonat Exploration Company. Therefore, Sea Robin's 270A and 225C lines are pipelines covered by the Lien Act only if they constitute "gathering lines" within the meaning of the statute. If, on the other hand, the pipelines at issue constitute "transmission lines", as Sea Robin contends, then the pipelines fall outside the scope of the Lien Act and are free of its encumbrances. Unfortunately, the Act itself does not define either type of pipe, and the few cases that do make the distinction between "transmission lines" and "gathering lines" articulate no bright line to tell the two apart.

## A. THE DEVELOPMENT OF THE DISTINCTION BETWEEN "GATHERING LINES" AND "TRANSMISSION LINES" IN LIEN ACT JURISPRUDENCE

Before 1984, the Lien Act contained neither the term "gathering line" nor the term "transmission line." Instead, the text of the Lien Act spoke only to work performed "in connection with the operation of any oil ... well or wells." In fact, the act did not specify its application to work performed on pipelines at all. Thus, before the 1984 amendment the language of the Lien Act left open the questions of whether the Lien Act applies to work performed on pipelines, and if so, to which pipelines it applies. Nonetheless, courts interpreted the Lien Act as applying to pipelines and distilled the distinction between "gathering lines" and "transmission lines" from the statute, even before the legislature incorporated that legal distinction into it.

In 1966, the Louisiana Court of Appeals for the First Circuit, in *McGee v. Missouri Valley Dredging Co.*, 182 So.2d 764 (La.App. 1966), laid the foundation for the Lien Act's application to pipelines, and more importantly, for reading the distinction between "gathering lines" and "transmission lines" into the Lien Act. The plaintiff in *McGee*, a surveyor, was hired by a prime contractor to perform surveying services in connection with the construction of a natural gas pipeline. Not having received payment for his surveying services, plaintiff asserted that he was entitled to a lien under the Lien Act. The *McGee* court held that the Lien Act did not cover the pipeline that plaintiff asserted his lien against because the pipeline was a "transmission line", which by definition, could

not be considered to function "in connection with" the operation of the well. *Id.* at 768. In finding that the pipeline constituted a "transmission line", the court stated:

> It is obvious that a 24 inch and a 30 inch pipeline are a transmission line. There is no allegation or proof in this record that the pipelines are a part of the gathering system of producing wells.

182 So.2d at 767.

Building on the foundation laid by the *McGee* Court, the Fifth Circuit, in another pre–1984 Lien Act case, *Continental Casualty Co. v. Associate Pipe & Supply Co.,* 447 F.2d 1041 (5th Cir.1971), shed light on the scope of the pre–1984 Lien Act as it relates to pipelines. In the case, the pipeline system, which was illustratively described as "a long leg with a three-toed foot on its end," consisted of four offshore platforms configured so that pipelines led directly from each of three of the offshore platforms to the fourth platform. At the fourth platform, the pipelines merged into a single line that led inland to a processing plant facility. *Id.* at 1045. Texaco owned every part of the system—the platforms, the wells serviced by the platforms, the pipelines and the inland plant facility.

The issue before the court was whether work performed on the pipelines described above constituted work performed "in connection with" the operation of the wells. The district court answered the question in the affirmative. It reasoned that the pipelines at issue constituted "gathering lines" and that, by definition, "gathering lines" are used "in connection with" well operation. On appeal, the Fifth Circuit affirmed the district court's conclusion and lent credence to the district court's use of the distinction between "gathering lines" and "transmission lines" to separate pipelines that are and are not used in well operation. *Id.* at 1052–53. The Fifth Circuit, however, emphasized that a grey area exists between pipes that are and are not used "in connection with" the operation of wells. *Id.* at 1052–53. And perhaps for lack of statutory guidance for defining the

point of demarcation, the Fifth Circuit declined to circumscribe the Lien Act's coverage.

In 1984, the Louisiana Legislature, concluding that the *McGee* and *Continental Casualty* opinions provided no panacea, landscaped the legal terrain upon which those cases were decided. Incorporating the prior Lien Act cases, the Louisiana Legislature amended the Lien Act to specify the types of pipelines that it covered. As amended, the Lien Act grants a lien to persons who perform labor, services or supplies

> in connection with ... any flow lines or gathering lines ... which are attached to or connected with the oil, gas or water well or wells, and any pipeline owned by the producer, operator or contract operator of the well.[1]

The only case that the parties have cited, and that this Court has located, dealing directly with the pertinent amended language is *Union Texas Petroleum v. PLT Engineering,* 895 F.2d 1043 (5th Cir.1990).

In *Union Texas,* Union Texas Petroleum hired PLT Engineering to build a pipeline to transport gas that it collected on its platform and from its well to a side tap in a transmission line owned by Columbia Gulf Transmission Company. *Id.* at 1049. In the case, the Fifth Circuit referred to the pipeline that PLT Engineering was hired to build as a "gathering line", and also held that the Lien Act burdened the pipeline. *Id.* The pipeline at issue in *Union Texas* is similar to the Sea Robin pipelines that are at issue before this Court, and therefore, barring further analysis of the case it might appear that the *Union Texas* case supports the position that Sea Robin's 225C and 270A lines are "gathering lines". However, the *Union Texas* court never discussed, and had no reason to discuss, the distinction between "gathering lines" and "transmission lines". It was not at issue.

Instead, the issue in *Union Texas* was whether the Lien Act requires, as the petitioner had contended, that three conditions

---

1. We note that under the amended language, Texaco's pipelines in *Continental Casualty* would clearly be covered by the Act since Texaco was the operator of the wells and the Act covers pipelines owned by the well operator.

be met in order for the Lien Act to burden a pipeline. The petitioner argued that three conditions were required: (1) that the pipeline is a gathering line or flow line, (2) that the pipeline owner also owns the well to which it is connected, and (3) that the pipeline owner also owns the connecting transmission line. Based on a textual reading of the Lien Act, Judge Brown, writing for a 3–Judge panel, rejected the tri-ownership requirement advanced by the petitioner and clarified that the letter of the Lien Act establishes two types of pipelines from which a lien might arise: (1) flow lines or gathering lines connected to the well and (2) pipelines owned by the well owner. *Id.* at 1050.[2] The pipeline in the *Union Texas* case fell within the second category of pipelines covered by the Lien Act—pipelines owned by the well owner—because the Union Texas Corporation owned both the well and the pipeline at issue. The court, however, did not opine as to the demarcation between "gathering lines" and "transmission lines"—a nuance that involves the former class of pipelines covered by the Lien Act. It left that issue for another day.

Today is that day. We face the issue of whether Sea Robin's pipelines fall within the first category of pipelines that are covered by the Lien Act—flow lines and gathering lines that are connected to the well. The first step towards resolving this definitional quagmire is to identify exactly what constitutes a "gathering line" under the Lien Act. As we have demonstrated, the Lien Act jurisprudence does not provide a focused analysis on sorting "gathering lines" from "transmission lines." Thus, we must look elsewhere.

## B. *WHAT IS A GATHERING LINE?*

Sea Robin argues, *inter alia*, that given the paucity of judicial guidance on the issue, we should defer to the Federal Energy Regulatory Commission's ("FERC") determination that the Sea Robin system is a transmission system. We find two faults with this approach. First, a pipeline is not a "transmission line" just because FERC says it is one. Second, we are assessing the type of two particular pieces of pipe, not the entirety of Sea Robin's vast integrated pipeline system as the FERC has done. The FERC characterized the Sea Robin system as a whole—consisting of its 438 mile facility that includes 102.9 miles of 30 inch diameter line and a 66.3–mile long, 36–inch diameter pipeline. By contrast, this court faces only the narrow question of whether Sea Robin's 270 Pipeline and 225 Pipeline are gathering lines within the meaning of the Lien Act.

Although neither party has suggested that we adopt FERC's method for distinguishing between "gathering systems" and "transmission systems", this is an approach that we considered. The FERC utilizes, what it calls, the "primary function" test in order to draw its line between "transmission systems" and "gathering systems". Among the factors the FERC considers are: the length and diameter of the lines, the geographic configuration, the operating pressure, location of compressors and processing plants, the purpose and location of the pipes, and the general business activity of the pipeline owner. *See, e.g., Sea Robin Pipeline Co.,* 71 FERC 61, 851 (1995). In applying the primary function test, the FERC does not apply the test's factors mechanically, but rather, considers each factor in an attempt to understand the nature of the system it is assessing.

We believe a wholesale adoption of the FERC's primary function test would be contrary to the Louisiana Legislature's intentions.[3] The Louisiana Legislature contemplated a clear line of distinction between pipelines that are and are not covered by the Lien Act. This is evidenced by the fact that the 1984 amendments seek to clarify the Lien Act's application to pipelines. Otherwise, subcontractors would not know before they

---

2. Citing caselaw that was incorporated into the Lien Act in 1984, Judge Brown explained that the inclusion of pipelines owned by the well owner in the Lien Act was always clear, but that the 1984 amendments were needed to clarify that gathering lines and flow lines were also covered by the Act.

3. We note that under the primary function test, Sea Robin's 225C and 270A pipelines would be considered "transmission lines." The most compelling factors include their large diameter and the fact that compressors are needed to push the gas landward.

contracted to perform a job whether the statute would insure payment for the work that they performed. We believe the ad hoc approach used by the FERC would subject sub-contractors to an unacceptable degree of uncertainty. Instead, a clear and practicable definition is in order. In searching for such a definition of the term "gathering line", we look first to the "ordinary meaning" of that term. *See* La.C.C. Art. 9.

 The Fifth Circuit has, for use in other contexts, defined the "ordinary meaning" of the term "gathering." In the natural-gas industry, the term "gathering" refers to:

> [The process of] collecting ... gas from various wells and bringing it by separate and individual lines to a central point where it is delivered into a single line. Following this concept, "gathering" is considered to have ended when the gas reache[s] the "central point" for delivery into a single line.

*Ben Bolt Gathering Co. v. Federal Power Comm'n*, 323 F.2d 610, 611 (5th Cir.1963); *see Continental Casualty*, 447 F.2d at 1052 (citing *Federal Power Commission v. Panhandle Eastern Pipe Line Co.*, 337 U.S. 498, 518, 69 S.Ct. 1251, 1263, 93 L.Ed. 1499 (1949) (Black, J., dissenting)). *See, also, Northern Natural Gas Co. v. F.E.R.C.*, 929 F.2d 1261, 1265 (8th Cir.1991) (Brown, J., sitting by designation), *cert. denied*, 502 U.S. 856, 112 S.Ct. 169, 116 L.Ed.2d 132 (1991); *Northwest Pipeline Corp. v. F.E.R.C.*, 905 F.2d 1403, 1404 (10th Cir.1990). We thereby hold that the "gathering" stage occurs between the production point, which is the well-head, and the collection point, which is generally defined by the point at which the line that leads away from the wellhead first intersects with a platform or rig. At that point, the gathering phase is over and the transmission stage begins—and any pipeline leading away from the platform or rig is a transmission line.[4] This definition is also consistent with the Supreme Court's edict that "gathering" is a term "narrowly confined to the physical act[s] of drawing gas from the earth and preparing it for the first stages of distribution." *Northern Nat. Gas v. State Corp. Com.*, 372 U.S. 84, 90, 83 S.Ct. 646, 650, 9 L.Ed.2d 601, 606 (1963) (interpreting the term "gathering" for purposes of FERC's jurisdiction).

 Applying the ordinary meaning of "gathering lines" to Sea Robin's pipelines, it is clear that Sea Robin's lines are not "gathering lines"; they are "transmission lines." The factual scenario in which each pipe—the 225C and 270A pipes—is involved is roughly the same. Gas flows from various wells by separate lines to a fixed platform. The gas is then collected from the separate lines at the platform and undergoes some limited processing in order to meet specifications required before it can enter Sea Robin's pipelines. After the collected gas meets the specifications, it is moved to a single line to be transported to the processing facility on shore. Sea Robin's 225C and 270A pipelines are the "single pipes" that the collected gas enters to begin its journey landward. They are, therefore, the "single lines" that the gas enters after it has been collected from the points of production. When the gas enters Sea Robin's pipes, it is already prepared for the first stages of distribution; the gas has already reached its "collection point". Accordingly, the 225C and 270A pipelines are "transmission lines" that facilitate the "transmission" phase of the industry, and are, therefore, beyond the scope of the Lien Act.

Accordingly, Sea Robin's Motion for Summary Judgment is hereby **GRANTED;** and McGee's and Falgout's Cross–Motions for Summary Judgment are hereby **DENIED.**

---

4. We note that if pipelines that transported gas from various platforms to land were defined as "gathering lines", then the lien claimant could assert a lien over any equipment, platform, etc. on any lease which the pipeline system services, even if the platform owner did not own or operate a single well.